

Sealed



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.**

**UNITED STATES OF AMERICA,**
**Ex Rel. BRUCE JACOBS,**
        **Plaintiffs,**

**vs.**

**JP MORGAN CHASE BANK, N.A.**

        **Defendant.**
_____/

FILED BY _____ D.C.

FEB 05 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

        **FILED *EX PARTE* AND UNDER SEAL**
        **PURSUANT TO 31 U.S.C. § 3730(b)(2)**

/TORRES



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.**

**UNITED STATES OF AMERICA,**
***Ex Rel.* BRUCE JACOBS,**

**Plaintiffs,**

vs.

**JP MORGAN CHASE BANK, N.A.,**

**Defendants.**
_____/

**FILED *EX PARTE***
**AND UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. 3730(b)(2)**

## FALSE CLAIMS ACT COMPLAINT

RELATOR, Bruce Jacobs, by and through his undersigned attorneys on behalf of the United States of America, brings this action under 31 U.S.C. §§ 3729-3732 (the federal "False Claims Act" or "FCA") to recover all damages, penalties and other remedies pursuant to the False Claims Act on behalf of the United States and themselves, and states:

### I.    JURISDICTION AND VENUE

1.    Jurisdiction of this Court arises under the FCA, 31 U.S.C. § 3732(a), and the federal question statute, 28 U.S.C. § 1331. Jurisdiction also arises under 28 U.S.C. §§ 1345 and 1355.

2.    Venue is proper in this District pursuant to the FCA, 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Each of the Defendants named herein transacted business within this District. Venue is also proper under 28 U.S.C. § 1391.

## II.    PARTIES

3.      BRUCE JACOBS ("Relator" or "Mr. Jacobs") is a citizen of Florida, residing in Miami-Dade County, Florida.  Mr. Jacobs is an attorney who practices law in the area of foreclosure defense and consumer protection in South Florida courts and advises in other states.  He began his legal career as a Miami prosecutor and thereafter represented financial institutions in foreclosures until he started his own law firm in 2006.  Since 2008, Mr. Jacobs has defended homeowners in foreclosure proceedings initiated by financial institutions such as JP Morgan Chase, Bank of America, Wells Fargo, and others.

4.      Mr. Jacobs himself is also a consumer who faced a foreclosure against his personal home that involved a forged endorsement of Countrywide Home Loans, Inc. ("Countrywide"), backdated by perjury by Senior Executives from Bank of America, N.A. ("BANA") that resulted in a different, but substantially similar, FCA case against BANA before the Honorable U.S. District Court Judge Ursula Ungaro.  See, U.S. ex rel. Bruce Jacobs v. Bank of America Corp., et. al., U.S. Dist. Ct. Case No. 1:15-cv-24585-UU.

5.      Defendant, JP Morgan Chase, N.A. ("JPMC") is an American multinational investment bank and financial services holding company headquartered in New York City. JPMorgan Chase is ranked by S&P Global as the largest bank in the United States and the sixth largest bank in the world by total assets, with total assets of over $2.7 trillion.  It is authorized to do business and does business in the Southern District of Florida.  It is also a party to the 2011 Consent Judgment with the Office of the Comptroller of the Currency (the "OCC Consent Judgment") and the 2012 $25 Billion National Mortgage Settlement. (the "NMS").  The false claims alleged herein all occurred after JPMC entered into the NMS and the OCC Consent Judgment and were never released or affected by the NMS, the OCC Consent Judgment, or any other settlement of any kind involving JPMC.

### III.   PLAINTIFF-RELATOR IS AN ORIGINAL SOURCE

6.      Mr. Jacobs is the original source of, and has direct and independent knowledge of, nonpublic information upon which the allegations herein are based. *See* 31 U.S.C. § 3730(e)(4)(B). *See* Fed. R. Civ. P. 9(b); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009); and *Bell Atlantic Corp. v. Twombly*, 425 F.3d 99 (2007).

7.      Specifically, Mr. Jacobs is the original source of evidence that JPMC submitted false claims to Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively "Fannie and Freddie") by making claims for payments while prosecuting foreclosures it knew would never result in "marketable title" as JPMC was engaged in a criminal enterprise that violates the Racketeering Influenced, Corrupt Organizations ("RICO") statute of Florida and Ohio.

8.      Specifically, JPMC used rubberstamps to affix blank endorsements for Washington Mutual Bank FA ("WAMU") on promissory notes WAMU originated years after WAMU ceased to exist.  These rubberstamps included forged signatures of Cynthia Riley, Jess Almanza, Brenda F. Brendle, Michele Mullholand, Robin E. Tange, and others as authorized signors for WAMU who no longer worked for WAMU at the time of endorsement because WAMU had ceased to exist before JPMC affixed those endorsements ("the Forged WAMU Endorsements").

9.      JPMC then committed repeated acts of perjury and falsely stated under oath that WAMU affixed those forged endorsements knowing WAMU no longer existed at that time, with the intent to defraud borrowers, state foreclosure courts, bankruptcy courts, federal regulators, Fannie Mae, Freddie Mac, and the U.S. Department of Justice ("DOJ") in foreclosures throughout Florida and across the nation.

Page 4 of 45

10.     Moreover, Mr. Jacobs is the original source of evidence that JPMC and its counsel since the robo-signing scandal have orchestrated bad faith, unethical litigation tactics designed to defy discovery orders, mislead the courts, and "gum up" the ability of state court foreclosure judges (and therefore federal bankruptcy judges) from fairly adjudicating the validity of these endorsements. This criminal misconduct constitutes both intrinsic and extrinsic fraud rendering the foreclosure title unmarketable and subject to a motion to vacate judgment due to fraud under Fla. R. Civ. P. 1.540(b) in Florida, and the corresponding rules of procedure in judicial foreclosure states across the nation.

11.     JPMC can never convey marketable title for properties obtained by foreclosure that relied on endorsements forged by JPMC, backdated by perjury of JPMC, and covered up by the unethical conduct of attorneys for JPMC. In Florida, it is a felony to forge an endorsement onto a promissory note.   Fla. Stat. §831.01, *McClendon v. State*, 290 So. 2d 77, 78 (Fla. 2d DCA 1974) ("The endorsement of a check may also be the subject of forgery…" if the signature is "intended to be taken as the genuine signature of another"). It is a felony to commit perjury. Fla. Stat. Ann. § 837.02 (West). It is a felony to obtain property by gross fraud and cheating. Fla. Stat. §817.29(West).

12.     The Relator is the original source of evidence that proves JPMC forged WAMU endorsements, backdated them by perjury to appear as the authentic endorsement of WAMU, defied discovery orders of multiple judges to cover it up, all in violation of Fla. Stat. §673.3081 and other relevant laws. Forgery, perjury, gross fraud and cheating are all enumerated predicate acts that violate Florida's RICO statute as codified by Florida Statute §895.03(2)(8) which defines 'racketeering activity' as any conduct defined as a crime chargeable under Fla. Stat. §831 relating to forgery, Fla. Stat. chapter 837, Fla. Stat. §817.29 relating to gross fraud and cheating.

13.     JPMC also defied the DOJ, the U.S. Department of Housing and Urban Development ("HUD"), and the Judiciary by continuing its systemic, widespread, criminal, fraud on the court across Florida and the across the nation knowingly violating Florida's RICO statute, the 2010 Office of the Comptroller of the Currency ("the OCC") Consent Judgment, and the DOJ $25 Billion National Mortgage Settlement since its execution in April of 2012, all to submit false claims for payments from Fannie and Freddie knowing the foreclosure titles were at all times unmarketable due to criminal fraud.

14.     Under the FCA, a violation occurs when a person or entity "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3279(a)(1)(A). Another kind of violation occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3279(a)(1)(B). "Material" for purposes of the FCA "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3279(b)(4).

15.     It is criminal for JPMC to affix an endorsement for WAMU after the Federal Deposit Insurance Company ("the FDIC") shut down WAMU. It is criminal for JPMC to testify falsely that WAMU imaged those original notes and affixed those WAMU endorsements all within days of origination when JPMC affixed WAMU endorsements years later. It is criminal for JPMC and its counsel to defy lawful court orders to produce the records that show how and when these rubber-stamped WAMU endorsements were affixed to original notes. It is fraud to fail to disclose material facts where there is a legal and ethical obligation to disclose those material facts which constitute a fraud and a crime. It is also grounds for an implied false certification theory of false claims.

16.     Every record JPMC presented in support of every request JPMC submitted

to Fannie and Freddie and every payment received from Fannie and Freddie while pursuing fraudulent foreclosures across Florida, and across the nation, knowing the RICO misconduct rendered the titles unmarketable each constitute individual false claims. All of this misconduct violated JPMC's representations and warranties as an approved servicer to Fannie and Freddie and shall be referred to herein as the "RICO False Claims Scheme."

17.     The federal False Claims Act was drafted "expansively … to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). A false promise to the Government, made with the intention of not performing the promise, is one type of fraud under the FCA. *See, e.g., United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494, 502 (8th Cir. 2016).

18.     Relator is the original source of additional information and has provided the government with information based on knowledge that is "independent of" and that "materially adds to" information that has already been publicly disclosed, which is evidence proving  JPMC used the RICO False Claims Scheme in foreclosures across the nation that post-date the April 2, 2014 Consent Judgment. 31 U.S.C. § 3730(e)(4)(B).

19.     Relator is an original source for two reasons. First, Relator has independent knowledge of JPMC's unlawful activity based on his own experience litigating foreclosure cases against JPMC and its counsel. *See Cooper*, 19 F.3d at 568 (finding the relator was an "original source" with "direct" and "independent" information because he acquired his knowledge of the wrongdoing through "three years of his own claims processing, research, and correspondence with members of Congress and HCFA," even though the complaint was filed after the release of Congressional reports and a hearing on similar allegations); *Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999).

20.     Second, the information allegedly uncovered by Relator "materially adds" to publicly-disclosed information because allegations that JPMC engaged in the RICO False Claims Scheme to coverup its criminal enterprise that prosecuted foreclosures for Fannie and Freddie in Florida and across the nation in violation of Florida's RICO statute since entering into the April 2, 2014 $25 billion National Mortgage Settlement Consent Judgment—and continued to rely on forged endorsements in violation of the $25 Billion NMS and Florida's RICO statute, which is "significant, influential or relevant information." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries*, LLC, 812 F.3d 294, 307 (3d Cir. 2016).

21.     Relator is an original source of information pertaining to JPMC's RICO False Claims Scheme because he "contributes information—distinct from what was publicly disclosed . . . that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'" *Majestic Blue Fisheries, LLC*, 812 F.3d at 307; *Battle*, 468 F.3d at 762 (noting that a plaintiff need not establish herself as the original source of the publicly disclosed information but must establish that she is an original source of the information in that she had direct and independent knowledge of the information on which she is basing her FCA claim"); *United States v. Med–Care Diabetic & Med. Supplies, Inc.*, No. 1081634CIVRYSKAMPHOP, 2014 WL 12279512, at *7 (S.D. Fla. Dec. 23, 2014); *Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999) (holding that a competitor who conducted an investigation and gleaned information "readily available to the government investigators . . . or even to members of the general public" was nevertheless an original source).

22.     "Pursuant to *Twombly* and *Iqbal*, a complaint will survive a motion to dismiss only if it contains factual allegations in addition to legal conclusions. Factual

allegations that are simply labels and conclusions, and a formulaic recitation of the elements of a cause of action are not sufficient. . . . [C]ourts need not accept the legal conclusions drawn from the facts alleged in a complaint, and they need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Cook v. Howard*, 2012 WL 3634451 (4th Cir. Aug. 24, 2012) (citations and internal quotation marks omitted). Mr. Jacobs has personally gathered all the documentation substantiating the allegations herein that JPMC knowingly submitted false claims to Fannie and Freddie, and ultimately to the U. S. Government.  Mr. Jacobs voluntarily provided all such information to the federal government prior to filing this action. See 31 U.S.C. § 3730(e)(4)(B).  The specifics of the fraud, and Mr. Jacobs' status as an original source, are more fully described below.

II.     **THE FALSE CLAIMS TO FANNIE MAE AND FREDDIE MAC**

23.     The Relator is the original source of evidence that proves JPMC as successor servicer to WAMU continued to violate representations and warranties made to Fannie and Freddie as set forth in the Fannie Mae Seller Guidelines[1] and Servicer Guidelines[2] and the Freddie Mac Seller/Servicer Guidelines.[3]

24.     These guidelines, (collectively, "the Fannie and Freddie Guidelines") set forth requirements to which JPMC and WAMU were legally bound to in the sale, servicing, and default servicing of loans which are extensive and comprehensive.  The Chart of Fannie and Freddie Guidelines applicable to the RICO False Claims Scheme.[1]

25.     The selling guide  sets forth that the Fannie and Freddie Guidelines require compliance with all applicable laws in the sale, servicing and default servicing of all loans

---

[1] https://selling-guide.fanniemae.com
[2] https://servicing-guide.fanniemae.com
[3] https://guide.freddiemac.com/app/guide/

sold to Fannie and Freddie. JPMC and WAMU both make representations and warranties to Fannie and Freddie that there are no misstatements, misrepresentations, or omissions that would affect enforceability of the note, the acquisition of good and marketable title to property, or compliance with applicable law.

26.   The selling guide sets forth that Fannie and Freddie Guidelines require Sellers and Servicers meet certain loan file requirements: (1) the note must be endorsed at the time of sale; (2) there must be an assignment of mortgage to ensure a complete chain of assignments is recorded in the public records; (3) the document custodian must certify the loans meet these requirements; the lender must review loans after closing the sale (including the note mortgage, and assignment) and correct any errors identified.

27.   Fannie and Freddie will not reimburse a servicer for fees incurred as a result of a breach of its representations, warranties, or obligations to comply with the law or satisfy its duties and responsibilities as a servicer.

28.   JPMC owed a legal duty to inform Fannie and Freddie that the original WAMU notes JPMC received were not endorsed in breach of WAMU's representations and warranties. Rather than cure the breach in compliance with all applicable laws, JPMC engaged in the RICO False Claims Scheme and became liable for false claims made to Fannie and Freddie for each and every successful request for payment on WAMU notes foreclosed using forged WAMU endorsements throughout Florida, and across the nation.

29.   The Relator is the original source of a list of examples of loans originated by WAMU, foreclosed upon by JPMC relying on the Forged WAMU Endorsements that resulted in the property being transferred to Fannie and Freddie with unmarketable title in Florida, Ohio, and across the nation. APPENDIX A is a chart of WAMU loans JPMC foreclosed upon using the Forged WAMU Endorsements and transferred title to Fannie or

Freddie as part of the much larger, nationwide RICO False Claims Scheme.

30.     The Relator is the original source of the representative sample of false claims in APPENDIX A, and alleges the RICO False Claims Scheme is nationwide in scope based on the testimony of JPMC which describes a system of affixing endorsements on WAMU notes that was national in scope.

31.     As a result of WAMU and JPMC's failure to disclose the lack of compliance with the Fannie and Freddie Guidelines, Fannie and Freddie made payments for the amounts of the foreclosure judgment in each loan identified in APPENDIX B, which it would not have made but for the failure to disclose.

32.     Moreover, as set forth in the Fannie and Freddie Guidelines referenced in APPENDIX A, JPMC submitted records to Fannie and Freddie in accordance with those Guidelines, as an approved servicer that caused Fannie and Freddie to make payments to JPMC for default servicing of each loan identified in APPENDIX B, and in other foreclosures that relied on Forged WAMU Endorsements throughout Florida and across the nation.  These records are false claims subject to statutory damages, treble actual damages, and attorney's fees as it violated the representations and warranties set forth in the Fannie and Freddie guidelines.

33.     Moreover, as set forth in the Fannie and Freddie Guidelines, JPMC received payments from Fannie and Freddie for default servicing of each loan identified in APPENDIX B, and others foreclosed upon using a Forged WAMU Endorsement throughout Florida and across the nation. These payments are also false claims subject to statutory damages, treble actual damages, and attorney's fees as it violated the representations and warranties set forth in the Fannie and Freddie guidelines.

34.     "Courts typically permit relators, once they have qualified as an original

source for a fraudulent scheme, to pursue the full extent of that particular scheme." *United States ex rel. Galmines v. Novartis Pharms. Corp.*, 88 F. Supp. 3d 447, 454 (E.D. Pa. 2015).

35.    A relator "need not establish herself as *the* original source of the publicly disclosed information but must establish that she is *an* original source of the information in that she had direct and independent knowledge of the information on which she is basing her FCA claim." *United States ex rel. Battle v. Board of Regents*, 468 F.3d 755, 762 (11th Cir. 2006) (emphasis in original).

36.    "Although the Relator here does not identify specific prescriptions ..., [he] does not reasonably have pre-discovery access to that patient-specific information." *United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001).

37.    "'[W]here a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme.'" *United States ex rel. Wood v. Allergan*, --- F. Supp. 3d ---, --- [2017 WL 1233991, *6] (S.D.N.Y 2017) (*quoting United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007)). In those circumstances, "it suffices for a relator to provide identifying information about a representative sample of false claims ...." Id. at --- [2017 WL 1233991, *30], certified for interlocutory appeal on other grounds, 2017 WL 1843288 (S.D.N.Y. May 4, 2017).

38.    The Eleventh Circuit follows the rule in *Wood*. *See United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002) ("the fraud was complex," but, "Clausen would have to allege at least some examples of actual false claims to lay a complete foundation for the rest of his allegations"); *United States ex rel. Sanchez*

*v. Lymphatx, Inc.*, 596 F.3d 1300, 1302-03 (11th Cir. 2010) (relator must "allege at least some examples of actual false claims" to "lay a complete foundation for the rest of her allegations").

39.     The Relator is not required to know everything that is occurring in every false claim across the nation. *See United States ex rel. Duxbury v. Ortho Biotech Prods.*, L.P., 579 F.3d 13, 30-32 (1st Cir. 2009). The Relator is not required to plead with specificity each and every claim they allege was false. Instead, the Relator may seek discovery after establishing the false claims are pled with specificity and are characteristic examples illustrative of the class of claims covered by the fraudulent scheme. *United States ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, *8 (N.D. Ga. Mar. 2, 2012) (citing Bledsoe, 501 F.3d at 510-11).

40.     JPMC has maintained the original WAMU notes since acquiring WAMU from the FDIC and has records that can identify each and every foreclosure for Fannie and Freddie that relied on the Forged WAMU Endorsements from evidence in its sole possession, care, custody and control. Where, as here, "[t]he Defendants possess information sufficient to identify all such claims "the plaintiff may plead based upon information and belief, ... provided that she 'accompan[ies] [her] legal theory with factual allegations that make [her] theoretically viable claim plausible.'" *United States ex rel. Hill v. Morehouse Med. Assocs.*, 2003 WL 22019936, *3 (11th Cir. Aug. 15, 2003) (citations omitted; interpolations by the Eleventh Circuit); *United States ex rel. Heater v. Holy Cross Hosp.*, 510 F. Supp. 2d 1027, 1033 (S.D. Fla. 2007) (citing *Hill*).

41.     The Relator is the original source of evidence that proves JPMC's claims were false as a result of the RICO False Claims Scheme because JPMC knew that the resulting conveyances of title to the foreclosed properties to Fannie and Freddie were not

"good marketable title" as required by Freddie Mac guideline 9301.40(a)[4] and Fannie Mae Servicing Guide e-4.2-01.[5] The copy of the Freddie Mac guideline 9301.40(a) entitled "Delivery of clear and marketable title" which explains the process by which JPMC could convey property to Freddie Mac in exchange for mortgage insurance benefits. [4] The copy of Fannie Mae Servicing Guide E-4.2-01 entitled "Completing Conveyance Documents" which explains the process by which JPMC could convey property to Fannie Mae.

### III.  THE RICO FALSE CLAIM SCHEME MEETS THE CRITERIA FOR INTERVENTION BY THE U.S. DEPARTMENT OF JUSTICE

42.     The false claims alleged against JPMC far exceed the criteria for prosecution set forth in the Memorandum of Understanding that describes the collaboration between the DOJ and HUD for matters referred to DOJ by a third party for potential FCA litigation.  APPENDIX B to this complaint is a copy of the HUD/DOJ Memorandum of Understanding dated October 11, 2019.

43.     Discovery will show these this false claim scheme involved foreclosures JPMC pursued across the nation resulting in a much larger number of false claims. Aggravating factors exist in that these violations are systemic, widespread, and committed by the largest bank in the United States in flagrant defiance of and disregard for the $25 billion NMS.  There is an exceptional need for the FCA to specifically deter JPMC, and generally deter other large financial institutions, that engage in fraud against the United States, which will generally serve the best interests of the United States.

---

[4] https://guide.freddiemac.com/app/guide/section/9301.40
[5] https://www.fanniemae.com/content/guide/servicing/e/4.2/01.html

### IV.   FALSE CLAIMS TO FANNIE AND FREDDIE ARE ACTIONABLE

44.   "Under current law, in order to qualify as a "claim" under the FCA, defendants' "request or demand ... for money or property" must be "presented to an officer, employee, or agent of the United States" or "a contractor, grantee or other recipient" of federal funds. 31 U.S.C. § 3729(b)(2)(A). In the case of requests made to contractors, grantees, and other recipients of federal funds, the FCA applies only (1) "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and (2) the Government either "provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." *United States ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C.*, 318 F. Supp. 3d 680, 705–07 (S.D.N.Y. 2018), reconsideration denied, 319 F. Supp. 3d 747 (S.D.N.Y. 2018).

45.   "Because the Treasury provided $200 billion to the [Government Sponsored Enterprises ("GSEs")] to stabilize the housing market following the mortgage crisis, the GSEs are "other recipients" of federal funds within the meaning of § 3729. With respect to prong one—advancement of a Government interest—the Government's interest here was in keeping the GSEs afloat and ensuring that their mortgage operations could continue. Indeed, the GSEs were not simply recipients of bailout funds, they were placed under Government conservatorship. The Recovery Act created the Federal Housing Finance Authority ("FHFA") and charged it with "oversee[ing] the prudential operations" of the GSEs and "ensur[ing] that" they "operate[ ] in a safe and sound manner," "consistent with the public interest." 12 U.S.C. § 4513(a)(1).

46.   The Act furthered authorized FHFA to "take such action as may be (i)

necessary to put the" GSEs "in a sound and solvent condition; and (ii) appropriate to carry on the business of the" GSEs and "preserve and conserve [its] assets and property." Id. at § 4617(b)(2)(D)… plainly the ability of the GSEs to efficiently liquidate their non-performing loans is a critical component of their operations and necessary to keep mortgage rates low. Federal funds were used "primarily to cover losses from single-family mortgages," somehow ignoring the fact that "losses" on mortgages include the costs of foreclosure. *Id.*

47.    "With respect to prong two—provision of federal dollars to a portion of the money demanded—the funds here are substantial and not earmarked, accordingly, it is not necessary to show that the funds were provided specifically to pay defendants' claims. Rather, the FCA applies as long as any portion of the claim is or will be funded by U.S. money. *Id., citing, U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (the FCA "does not make the extent of [the funds'] safeguard dependent upon the bookkeeping devices used for their distribution"); *United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 738–39 (D.C. Cir. 1998).

48.    "Because the GSEs are in Government conservatorship they can draw each quarter from Treasury their "deficiency amount"—i.e., the "amount, if any, by which … the total liabilities of [Fannie Mae or Freddie Mac] exceed … total assets"—up to a specified limit. Thus, every dollar subtracted from the bottom line of the GSEs by fraud is potentially passed along to the Government to the extent it results in or worsens a net shortfall. In the event of a net shortfall, the Government is contractually obligated to cover the shortfall. Indeed, the Government did so to the tune of billions of dollars. *Id.…*

49.    "The bailout funds are vastly larger than the annual revenues of the GSEs. Accordingly, during the period when the GSEs were losing money, the claims were

virtually guaranteed to be paid with federal funds. Beginning in 2013, once the GSEs began to earn profits, each GSE was obligated to pay Treasury its net worth each quarter less a small capital buffer, such that any request for payment on a false claim after 2013 decreased the amount that Treasury received from the GSEs dollar-for-dollar. Accordingly, adopting a definition of "claim" that would include the GSEs would not expand the FCA beyond Congress' intent, rather it would allow the Government to prosecute fraud on behalf of a taxpayer-supported entity that is in federal conservatorship—precisely what Congress had in mind when it amended the statute." *Id.*

50.    The dividends that Treasury has received are equivalent to interest payments owed to the taxpayers for putting their capital at risk. It is inapposite to whether the false claims in this case caused an economic loss to the Government that, as the supermajority shareholder of the GSEs, the Treasury may ultimately earn substantial returns on its investment. It would still be the case that every dollar extracted from the GSEs by fraud would be a dollar less in return to the Government.

51.    Accordingly, because the claims paid for reimbursement of foreclosure expenses were monies "spent or used to advance a Government program or interest" and because the Government provided a "portion of the money or property requested or demanded," this complaint adequately alleges "claims" within the meaning of the FCA as regards Fannie Mae and Freddie Mac. *Id. See also, Bacewicz v. Molecular Neuroimaging, LLC,* 3:17-CV-85-MPS, 2019 WL 4600227, at *7 (D. Conn. Sept. 23, 2019)(noting that claims submitted to Fannie Mae and Freddie Mac, which received substantial government bailout funds, are "claims" within the meaning of the FCA, even though they are independent for-profit companies).

## V.    PLAINTIFF- RELATOR'S ORIGINAL DISCOVERIES

52.     In his 12 years defending foreclosures, Relator has discovered that JPMC intended to (and did) engage in a practice of misleadingly pursuing a wave of WAMU foreclosures filed without copies of endorsed promissory notes, claiming the original notes were lost, when the notes were not lost, in foreclosures across Florida and across the nation.

53.     After the federal regulators and the U.S. DOJ forced JPMC into consent judgments for billions of dollars for filing false, fictitious and robo-signed mortgage assignments as evidence of the right to foreclose in cases throughout Florida and across the nation, the Relator continued to defend foreclosures where JPMC produced the original note with forged endorsements by Cynthia Riley.

54.     Cynthia Riley was the head of JPMC's Secondary Marketing Department and gave perjured testimony that WAMU affixed her endorsement stamp to original notes after JPMC laid Ms. Riley off and shut down her department in Jacksonville, Florida.  The continued practice of forging endorsements after agreeing to the NMS Consent Judgment that expressly barred the use of anything other than "competent" evidence in foreclosures violated Florida law, the Fannie and Freddie Guidelines, and the OCC and DOJ Consent Orders JPMC signed after agreeing to pay billions of dollars in penalties.

55.     As Relator discovered, JPMC intended to (and did) rely upon Forged WAMU Endorsements which were backdated by perjury to suggest WAMU had a system of imaging original notes and affixing WAMU rubberstamped endorsements within days of origination.  JPMC falsely testified that original WAMU notes were sent from closing tables across the country to the "Post Closing" department headed by Barbara Hindman where they were imaged within days of that closing.

56.     Then the notes were allegedly walked next door to WAMU's Secondary Delivery department which had a team of the unauthorized signors affixing Ms. Riley's

signature, who was allegedly an authorized signor, although Ms. Riley was not actually employed as an authorized signor, present when the stamps were affixed, and who did not intend to adopt those signatures at the time of the stamping. JPMC also continued to submit false statements and testimony about when the endorsements were stamped to this day.

57.    Relator discovered information showing that, when signing the $25 Billion National Mortgage Settlement Consent Judgment, JPMC falsely promised to ensure compliance with "Servicing Standards" that included standards for presenting documentation in foreclosure and bankruptcy cases. As alleged herein, that promise was false when it was made, at the time of signing, on or about April 4, 2012.

58.    Instead of intending to comply with the Servicing Standards for foreclosures as provided in the JPMC NMS Consent Judgment, JPMC intended to commit new felony misconduct by the RICO False Claims Scheme promptly after April 4, 2012, and they have done so regularly since then and continuing to this day in foreclosure actions throughout Florida and across the nation.

59.    On January 15, 2013, JPMC produced Cynthia Riley for deposition in Miami Dade County Circuit Court Case *JPMC v. Orozco*, Case number 09-29997 CA (01). APPENDIX C to this complaint is a copy of Ms. Riley's deposition. Ms. Riley testified that WAMU had a practice to image and endorse notes within days of origination. She further testified a team of WAMU employees used rubberstamps with her signature at the WAMU Secondary Delivery Department located in Jacksonville, Florida, until 2006 when WAMU shut down Secondary Delivery and laid everyone off, including Ms. Riley.

60.    After evidence appeared that JPMC produced WAMU notes with Ms. Riley's endorsement that originated after 2006, JPMC filed an affidavit signed by Ms. Riley claiming the Secondary Delivery department was not shut down, but moved from

Jacksonville, Florida to Florence, South Carolina in 2006 in a lawsuit pending in the U.S. District Court of Colorado in case number 1:16-cv-00020-CMA-MEH.  APPENDIX D to this complaint is a copy of Ms. Riley's affidavit.

61.     The instant action does not seek relief on the basis that the Relator was an original source of Ms. Riley's testimony.  Rather, Relator is the source of other information showing Ms. Riley's testimony is demonstrably false raising additional and different acts of fraud committed by JPMC against the United States, which occurred years after JPMC negotiated and signed the NMS Consent Judgment on April 4, 2012, and thereafter.

62.     Relator's claims are not based solely upon these prior public disclosures and do not hinge not on conduct uncovered before the Consent Judgment, or uncovered in prior foreclosure cases defended by other counsel wherein JPMC and its counsel convinced trial courts to grant foreclosure judgments and convinced Fannie and Freddie to make payments by withholding material information JPMC was legally obligated to disclose.

63.     Rather, the Relator has acted as lead foreclosure defense counsel in multiple cases wherein JPMC relied on forged Cynthia Riley WAMU endorsements in Miami-Dade County and Palm Beach County years after the April 2, 2012 Consent Judgment.  The Relator drafted every pleading, conducted every deposition, and attended every court proceeding which led to the discovery of evidence to prove JPMC engaged in the RICO False Claims Scheme.  Eventually, the Relator's work escalated to JPMC's "outside counsel" which has orchestrated the effort to mislead the courts with unethical arguments to assist JPMC in continuing this RICO False Claims Scheme without detection.

64.     On December 13, 2017, the Relator obtained a final judgment in favor of his client in a foreclosure prosecuted by JPMC as servicer for <u>Wells Fargo Bank, N.A., as trustee for WAMU Mortgage Pass Through Certificates Series 2005-PR4 Trust vs. John</u>

Riley, in Palm Beach County Case Number 50-2016-CA-010759-XXXX-MB. APPENDIX E is a copy of "the Riley Order." The Honorable Senior Circuit Court Judge Howard Harrison found "unclean hands" noting JPMC presented a false mortgage loan schedule, a false mortgage assignment, and an undated Cynthia Riley rubberstamped blank endorsement from WAMU "as evidence of standing after disobeying a court order to compel the evidence in its possession that would establish whether the endorsement violated Fla. Stat. §673.3081." *Id.* ¶¶1-33. JPMC later dismissed its appeal of the Riley Order, satisfied Mr. Riley's mortgage, and paid a confidential amount to settle the unclean hands allegations. APPENDIX F is a copy of the dismissal package for the Riley case.

65.    Thereafter, the Relator defended a foreclosure that relied on the same forged Cynthia Riley WAMU endorsement before the Honorable Miami-Dade Circuit Court Judge William Thomas in *JP Morgan Chase v. Queen Mohammed*, in Miami-Dade Case Number 2015-23492-CA-01. In Judge Thomas' case, JPMC produced a report that shows the Mohammed note was originated on September 13, 2007, and that WAMU scanned the Mohammed note without any endorsements into WAMU's system nearly a month later on October 4, 2007. APPENDIX G is a copy of the Docline Report for the Mohammed Loan.

66.    JPMC concedes any image of the original note scanned into WAMU's system before the FDIC shut down WAMU had no blank endorsement from WAMU. The Docline Report shows the first image in JPMC's system of the Mohammed's original note with a rubberstamped Cynthia Riley blank WAMU endorsement is dated January 20, 2010. JPMC produced no competent evidence that WAMU affixed the Cynthia Riley endorsement to the Mohammed's note before shutting down in September of 2008. JPMC eventually escalated the case to its Outside Counsel who is defying discovery orders and failing to disclose material facts necessary to avoid assisting JPMC in the fraud and crimes.

67.    On January 26, 2018, JPMC produced Jeremy Summerford as a corporate

representative for the first time in Judge Thomas' case. APPENDIX H is the

JPMC/Summerford I Transcript in which JPMC testified that:

| | | |
|---|---|---|
| Pg 27:5-15 | Q | Now, do you have any evidence to show one way or another whether or not this endorsement was affixed before JPMorgan Chase bought the assets of Washington Mutual from the FDIC or after? |
| | A | Again, as I've answered before, there's no date of the endorsement. I don't know when it was specifically affixed. All I can tell you is the scan in 2010 of the note as it appears attached to the complaint, it was scanned with the endorsement on there in 2010. So, at least, by 2010, I can tell it was affixed. |
| Pg 31: | Q | So is it fair to say that the 2007 image of the [Mohammed] note had no endorsement on it? |
| | A | From what I recall of my review, they did not have the endorsement on there, which would be consistent with getting a package from the origination. That's typical. |
| Pg 114:7- | Q. | Is there any evidence that you have to show that this note was endorsed before Washington Mutual ceased to exist? |
| | A. | You're asking me to basically disprove a negative. I told you what I know. I don't have a specific date on when the endorsement was placed. I don't know when the specific endorsement was placed. All I know is that it was before 2010. That's all I know. |
| Pg. 125-126 | Q. | So is it fair to say that you have not been told anything about how the Cynthia Riley endorsements were added to these Washington Mutual Loans and when? Is that true? |
| | A. | I really don't know anything surrounding Cynthia Riley and how those were placed by her on those notes. |

68.    While Judge Thomas ordered JPMC and its counsel to provide discovery

about the Cynthia Riley WAMU endorsements, the Honorable Miami-Dade Circuit Court

Judge David Miller also ordered discovery in furtherance of an Amended Rule 1.540(b)

Motion to Vacate Judgment Due to Fraud Upon the Court Relator filed in *U.S. Bank v.*

*Jorge Llovet*, in Miami-Dade Circuit Court Case Number 2016-32717-CA.  The discovery required JPMC, as Master servicer for U.S. Bank, to explain the same Cynthia Riley endorsement presented as evidence of standing to Judge Miller which resulted in a final judgment of foreclosure.  Once again, the case before Judge Miller escalated to the same JPMC Outside Counsel who orchestrated a scorched earth effort to defy Judge Miller's orders and assist JPMC in the commission of the RICO False Claims Scheme.

69.     JPMC and its Outside Counsel again presented Jeremy Summerford to testify as a JPMC corporate representative pursuant to Judge Miller's order on April 19, 2019.  APPENDIX I is a copy of the JPMC/Summerford II deposition transcript.  Relator questioned Mr. Summerford who testified that to prepare for this second corporate representative deposition, he spoke only with JPMC inhouse counsel and the same Outside Counsel.  APPENDIX I, 121:11-122:11.

70.     Mr. Summerford then changed his testimony that he knew nothing about the Cynthia Riley endorsements from January of 2018 to state he attended two powerpoint trainings about the WAMU endorsements, one given by Outside Counsel in approximately 2016, and a second given by Vicky Weaver in 2018.  APPENDIX I, pg 96:16-25; 106:7-107:16.  JPMC now claimed Outside Counsel gave a powerpoint presentation that WAMU imaged notes and endorsed them within days of origination and that Vicky Weaver trained JPMC trial witnesses that JPMC never used WAMU stamps to endorse original notes.  APPENDIX I, 109:3-110:21; 116:16-117:15; 120:11-17.  At the conclusion of the Second JPMC deposition, Mr. Summerford confirmed there were two powerpoint presentations concerning the WAMU endorsements.  APPENDIX I, 128:23-129:24.

71.     Relator litigated another foreclosure involving a different method JPMC used to add endorsements after filing the complaint in <u>Chase Home Finance v. Lumar</u>

before the Honorable Miami-Dade Circuit Court Judge Beatrice Butchko in Miami-Dade Circuit Court Case Number 2008-71826-CA-01.   Judge Butchko ordered JPMC and the same Outside Counsel to produce witnesses regarding a motion for sanctions for defying her orders to produce discovery related to the fraud.   Outside Counsel and JPMC produced Vicky Weaver, a senior JPMC executive and the head of JPMC's custodial division which holds original notes.   APPENDIX J is a copy of the Vicky Weaver Deposition Transcript. Ms. Weaver testified she attended a powerpoint training with Mr. Summerford, other JPMC witnesses, and the same Outside Counsel, but that training never discussed WAMU endorsements. APPENDIX J, pg 33:8-41:24.   Ms. Weaver explained that Ms. Barbara Hindman, who previously worked for WAMU, told her WAMU imaged and endorsed notes within days of origination.   APPENDIX J, pg 31:15-41:24.

72.      Thereafter, Judge Thomas ordered JPMC to produce the powerpoint trainings involving WAMU endorsements on August 29, 2019.   APPENDIX K is Judge Thomas' order to produce powerpoints.   On June 13, 2019, the same Outside Counsel filed a response that "No such Powerpoint presentations exist. Based on a recent pleading filed with the Court, it appears that Mr. Jacobs is basing his false assumption on a gross mischaracterization of testimony given by a Chase corporate representative. Additionally, any Powerpoint presentations prepared and presented by outside counsel and providing witness training, though non-responsive, are protected by attorney-client and or work product privilege." APPENDIX L is Outside Counsel's response to Judge Thomas' order. On January 14, 2020, Outside Counsel represented to Judge Thomas that they have never presented a training for JPMC, including for Jeremy Summerford, regarding WAMU endorsements.   APPENDIX M is a copy of Judge Thomas' order documenting Outside Counsel's representation.

73.     On December 6, 2019, the Honorable Miami-Dade Circuit Court Judge

Pedro Echarte, Jr. ordered JPMC to produce a corporate representative to testify at trial in

*U.S. Bank Trust, NA v. Steve Piecznick* in Miami-Dade Circuit Court Case Number 2016-

14544-CA-01.     APPENDIX N is the transcript excerpt of the JPMC corporate

representative Pamela Bingham.  JPMC, again represented by the same Outside Counsel,

testified that according to Barbara Hindman, a former WAMU executive in charge of the

Post-Closing Department located in Jacksonville Florida.  APPENDIX N, pg 12:20-pg

13:18.  JPMC testified WAMU standard operating procedure was for the post-closing

department to receive original notes and image them, then walk the notes next door to the

Secondary Delivery department which affixed the rubberstamped WAMU Cynthia Riley

endorsement.  APPENDIX N, pg 13:7-14:10; 16:7- 17:16; 17:25-18:14; 19:23-20:9; 21:23-

22:4; and 23:8-13.   JPMC testified there is no records, "no footprint, anything – any

remnant of anything that is in Chase's possession that would show the existence of this

system that was used to endorse millions of notes across the country" besides the

endorsements.  APPENDIX N, 30:3-13; 62:12-17.

74.     JPMC then testified there was no trainings of any kind given to JPMC trial

witnesses since May of 2013.  APPENDIX N, 33:16-24; 35:12-19.  No training by Outside

Counsel in the last three years as Mr. Summerford testified to in his second deposition,

after previously testifying in his first deposition in January of 2018 that there were no

training at all about the WAMU endorsement. APPENDIX N, 37:3-6; 69:6-14.   No

trainings by Vicky Weaver attended by Outside Counsel.  APPENDIX N, 37:13-39:7.

JPMC admitted that JPMC's Outside Counsel and inhouse counsel prepared Mr.

Summerford to give testimony, which JPMC concedes is a complete and utter fabrication.

75.     JPMC then went on to testify that WAMU's "daily practice" was that all

notes were imaged within "a couple of days" of origination by Barbara Hindman's group, then endorsed, and then sent to the secured vault in Monroe, Louisiana where the endorsed note would be imaged a second time. APPENDIX N, 57:15-58:8; 59:9-15. JPMC testified that all images of notes were given to JPMC after the FDIC sold the assets of WAMU to JPMC. APPENDIX N, 59:21-60:2.

76.     During this testimony documenting what evidence JPMC should have if the testimony of Cynthia Riley, Jeremy Summerford, Vicky Weaver, and Pamela Bingham were truthful, Plaintiff's counsel asked for a short break presumably to use the restroom. APPENDIX N, 60:13-18. During the recess, Outside Counsel took the JPMC witness into the stairwell. After initially denying that they discussed her testimony, Ms. Bingham admitted she and Outside Counsel discussed her conversation with Ms. Hindman which is the basis for her testimony. APPENDIX N, 60:22-61:17.

77.     Thereafter, the Judge Echarte confirmed Ms. Bingham's testimony before going into the stairwell with Outside Counsel was that once a note gets originated, it goes to Barbara Hindman's department, its imaged, an endorsement is added, its sent to Louisiana, and then at some point before WAMU ceased to exist, the note was imaged again with the endorsement. APPENDIX N, 73:19-74:2. After going into the stairwell with Outside Counsel, JPMC changed its testimony claiming the WAMU process did not image endorsed notes. APPENDIX N, 77:3-83:7. As questioning continued, Judge Echarte threatened to hold Outside Counsel in contempt after the Relator heard him giving an answer to a question from across the courtroom. APPENDIX N, 86:7-87:6.

78.     Not only is the WAMU rubber stamped endorsement a forgery backdated by repeated acts of perjury, it is invalid under Florida law as a signature even if JPMC's testimony was truthful. Under Article 3 of the Uniform Commercial Code, a surrogate

signed stamp is not valid as a signature to constitute an endorsement that would permit a subsequent holder of the note to exercise any rights in the note, including any right to foreclose a mortgage that secured the note. Under Article 3, a valid signature is "a word, mark, or symbol executed or adopted by a person with present intention to authenticate a writing." "Surrogate signing" occurs when unauthorized signors affix the signatures of an authorized signor outsider his or her presence and control.

79.   JPMC intended to (and did) pursue judicial foreclosure of mortgages secured by those forged and falsely-stamped notes, while concealing the fact that the endorsements were affixed by JPMC years after WAMU ceased to exist using rubber stamps of Cynthia Riley's signature, and others. These purported authorized signors lacked any present intention to authenticate their signatures and were not WAMU employees or authorized to sign endorsements for WAMU at the time of stamping their signatures.

80.   Under traditional principles of equity that govern foreclosures, a plaintiff lacks equitable standing to enforce a mortgage that secures a promissory note, unless the plaintiff was a holder and owner of the note itself, at the time when the foreclosure action is commenced. Thus, "[w]here the plaintiff contends that its standing to foreclose derives from an endorsement of the note, the plaintiff must show that the endorsement occurred prior to the inception of the lawsuit." *McLean v. JP Morgan Chase Bank Nat'l Ass'n*, 79 So. 3d 170, 174 (Fla. 4th DCA 2012). Nevertheless, JPMC intended to (and did) pursue judicial foreclosure cases to enforce mortgages secured by notes that had not been endorsed to them at the time of filing those cases.

81.   Florida Rule of Civil Procedure 1.540(b) provides that judgments procured by fraud may be vacated for up to a year when the fraud is intrinsic (perjury and forgery) and may be attacked after a year by an independent action when the fraud is extrinsic. The

Eleventh Circuit Court of Appeal instructs that extrinsic fraud on the court, for which there is no one year limitation to file a motion to vacate a judgment for fraud on the court, "embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Zakrzewski v. McDonough*, 490 F.3d 1264, 1267 (11th Cir. 2007); *citing, Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir.1985).

82.     Since the robo-signing scandal, JPMC's Outside Counsel has acted as primary counsel to defend JPMC from serious allegations of widespread fraud on the state foreclosure courts and bankruptcy courts across the nation.  Outside Counsel violated its own ethical obligation to the integrity of foreclosure proceedings and assisted JPMC in the commission of a crime and a fraud.

83.     Outside Counsel lacked candor to the tribunal in violation of Fla. Bar Rule 4-3.3(a)(2) which creates a legal obligation for counsel to "disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client." Fla. Bar. R. 4-3.3.  The Florida Supreme Court instructs that "a fraud is committed for the failure to disclose material information only when there is a duty to disclose such; and such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them. *Mark Marks*, 654 So.2d at 1189 (*citing Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)); *see also Gutter v. Wunker*, 631 So.2d 1117, 1118 (Fla. 4th DCA 1994)." *State v. Mark Marks*, P.A., 698 So. 2d 533, 539 (Fla. 1997).

84.     JPMC's Outside Counsel owed a legal duty under the Florida bar rules to disclose the material facts it knew that would otherwise assist in the commission of the

criminal acts of forgery, perjury, and gross fraud and cheating which also violate Florida's RICO statute. Instead, Outside Counsel worked with JPMC to orchestrate a national plan of obstruction, obfuscation, and failure to disclose material facts even during the HUD/OIG investigation into its document execution practices. This is the type of fraud on the court "perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication" that would allow an independent action to vacate a judgment due to fraud beyond one year. *Zakrzewski v. McDonough*, 490 F.3d 1264, 1267 (11th Cir. 2007). Accordingly, all foreclosure judgments obtained by JPMC presenting the Forged WAMU Endorsements can be still be challenged by an independent action to vacate those judgments for fraud on the court under Fla. R. Civ. P. 1.540(b).

85.     As such, JPMC could not convey "good marketable title" even if the title would ultimately survive a challenge in court because the title is not free from reasonable doubt as to any question of law or fact necessary to sustain its validity. The Eleventh Circuit has made clear that "[m]arketable title is unencumbered title, free from reasonable doubt as to any question of law or fact necessary to sustain its validity. *Matter of Garfinkle*, 672 F.2d 1340, 1345 (11th Cir. 1982) (internal citations omitted). "Marketable title is not necessarily perfect title, nor must it satisfy the purchaser or his attorney, unless there is an express stipulation to that effect." *Id.*

86.     For this reason, courts have explained that marketable title refers "not merely a title valid in fact but a title that must be such as to make it reasonably certain that it will not be called in question in the future" or, in other words, title that will not "subject the purchaser to the hazard of litigation with reference thereto." *In re Aman*, 492 B.R. 550, 565–66 (Bankr. M.D. Fla. 2010); *Camp v. Commonwealth Land Title Ins. Co.*, 787 F.2d

1258, 1261 (8th Cir. 1986) ("Reasonable doubt affecting marketability is said to exist where 'there is uncertainty as to some defects appearing in the course of its deduction, and the doubt must be such as affects the value of the land, or will interfere with its sale.'").

87.     In light of this case law, it is more than plausible that uttering forged rubber-stamped WAMU endorsements on WAMU promissory notes as part of a nationwide effort by JPMC and its Outside Counsel to defraud the courts and the federal government did not convey marketable title. *Matter of Garfinkle*, 672 F.2d at 1345; *Denson v. Stack*, 997 F.2d 1356, 1363 (11th Cir. 1993) (concluding that district court "improperly concluded" that the defendant "was in a position to convey marketable title" and noting that title "is free from reasonable doubt when a litigant cannot point to a fact in the record which would cause a reasonable person to have a doubt").

88.     The fact that JPMC submitted claims for benefits based on foreclosure judgments obtained by uttering forged endorsements in violation of Florida criminal law and the NMS, before or after the commencement of the action, is material to Fannie and Freddie in deciding whether to pay the claim. That fact – and the failure to disclose that fact – are material to Fannie and Freddie, because the applicable regulations require conveying "good marketable title" when making a claim. Contrary to their promises in signing the JPMC NMS Consent Judgment on April 4, 2012, JPMC never intended to stop misleading courts about false evidence used to establish its right to foreclose WAMU notes.

## VI.     OVERVIEW OF THE PRIOR FALSE CLAIMS ACT RELATOR SUCCESSFULLY PROSECUTED AGAINST BANK OF AMERICA

89.     On June 4, 2012, Relator was sued for foreclosure of the mortgage against his home that secured a promissory note. That lawsuit resulted in Relator's discovery of the fraud and false claims alleged in the action filed against BANA before Judge Ungaro.

The foreclosure complaint included a copy of the original note as signed the Relator, together with an "allonge" – which is a paper attached to a note for the purpose of adding endorsements. APPENDIX II A is a copy of the allonge that was attached to the note when the foreclosure complaint against the Relator's home was filed. It showed an endorsement from the original lender, in favor of "Countrywide Document Custody Services, A Division of Treasury Bank, N.A." In turn, according to additional endorsements on the allonge, the note had been endorsed to Countrywide Home Loans, Inc. and subsequently endorsed in blank – meaning, with no specified endorsee – by Countrywide Home Loans, Inc. Those endorsements purportedly were signed by Laurie Meder, as Vice President of Countrywide Document Custody Services A Division of Treasury Bank, N.A; and by David Spector, as Managing Director of Countrywide Home Loans, Inc.

90.     The foreclosure complaint of June 4, 2012 led Relator to discover that the endorsements on the allonge had been forged and fabricated by BANA. Back on October 14, 2008, Countrywide Home Loans had provided to Relator a copy of the Relator's promissory note pursuant to his request – and, at that time it did not contain any endorsements or an allonge. APPENDIX II B is a copy of that version of the note, together with Countrywide's cover letter of October 14, 2008.

91.     Furthermore, as Relator discovered, David Spector had already resigned from Countrywide in 2006. Therefore, as the Relator discovered, the purported "signature" of Mr. Spector was not genuine but was a forgery. Relator's personal discovery of this information was confirmed, in subsequent discovery, when Relator obtained a document showing that Bank of America had affixed the purported endorsements on or after August 30, 2011 – five years after Mr. Spector's departure. APPENDIX II C is a copy of the screenshot showing the August 31, 2011 date of the purported Countrywide endorsements

Relator obtained in August 2015.

92.     Relator was the original source of evidence that proved Bank of America gave suborned perjury from senior executives who testified all Countrywide notes were imaged and then endorsed within days after the origination of each note.[6]   Through his own efforts, Relator obtained repeated examples that proved BANA and Countrywide had no images of notes from within days of origination and the images of notes in their possession made weeks, months, and years of origination had no rubberstamped Countrywide endorsements.

93.     Although the U.S. Government declined to intervene, Judge Ungaro denied BANA's motion to dismiss the FCA case finding that "[u]sing rubberstamped endorsements on promissory notes ... to foreclose on properties or obtain orders of sales falls within the scope of actions barred by the [$25 Billion National Mortgage Settlement] as using facially invalid promissory notes in foreclosure proceedings could constitute relying on 'materially inaccurate information' in pleadings, affidavits, sworn statements, or declarations." *Jacobs v. Bank of Am. Corp.*, 1:15-CV-24585-UU, 2017 WL 2361943, at *19-20. (S.D. Fla. Mar. 21, 2017), on reconsideration, 1:15-CV-24585-UU, 2017 WL 2361944 (S.D. Fla. Apr. 27, 2017).

94.     Judge Ungaro also found the BANA False Claims Act Complaint "alleges facts that give rise to a 'reasonable inference' that BANA signed the [$25 Billion National Mortgage Settlement] with the intent to 'continue pursuing mortgage foreclosures by misleadingly filing copies of promissory notes bearing rubber-stamped endorsement

---

[6] JPMC has given the same false testimony that all WAMU originated notes were imaged and then endorsed within days of origination.  Relator is the original source of evidence which shows this is false as set forth below.

signatures that were not legally authorized by the purported signatories (and therefore, were invalid).'" *Id.* at 21. In the BANA False Claims Act case, BANA's Third Party Vendor, Sourcecorp, responded to a subpoena for records stating BANA ordered "an extensive project to purge all its data, which we were obligated to do." The email stated:

Case 1:15-cv-24585-UU   Document 178-11   Entered on FLSD Docket 06/19/2017   Page 1 of 3
**Friday, June 16, 2017 at 1:34:35 PM Pacific Daylight Time**

| | |
|---|---|
| **Subject:** | RE: Subpoena to SOURCECORP - United States Ex Rel. Bruce Jacobs vs. Bank of America Corporation |
| **Date:** | Friday, June 16, 2017 at 8:25:43 AM Pacific Daylight Time |
| **From:** | Dimple Sehgal |
| **To:** | Kohn, Robert |
| **CC:** | Rachel Rose, Court Keeley, Anna Morales |
| **Attachments:** | image004.jpg, image005.jpg, image006.gif, image007.png |

Rob,

I don't believe we have anything more to produce, after our call on Wednesday we pushed to find all we could. We have confirmed that back in Feb 2016, BOA had us execute an extensive project to purge all its data, which we were obligated to do. Therefore, this is all we have.

Thank you,

Dimple Sehgal
Corporate Counsel
**SourceHOV**
2701 E. Grauwyler Road
Irving, TX 75061
United States
o: +1. 972.821.4784 | m: +1.469.954.2216
dimple.sehgal@sourcehov.com

95. At BANA's direction, while BANA's counsel fought two state court subpoenas for those records, Sourcecorp executed a "Fastrieve Purge" which took 90 days to destroy over 1.88 billion objects of data, metadata and encryption keys related to BANA's secret forgery process. Sourcecorp continued the purge for over a month after being served with both subpoenas for those records. APPENDIX II D is a copy of the Fastrieve Purge Final Report Email. The BANA false claims act case settled after the close of discovery. APPENDIX II E is a copy of the order of dismissal, joint stipulation for dismissal, and the stipulation for settlement resolving the BANA false claims act case.

## VII.   OVERVIEW OF THE HISTORICAL BACKGROUND SUPPORTING THE PRESENT FCA CASE AGAINST JP MORGAN CHASE

96. JPMC used a nationwide, systemic practice to foreclose using Forged WAMU Endorsements under Article 3 of the Uniform Commercial Code which instructs that endorsements are presumed authentic until "some evidence is introduced which would

support a finding that the signature is forged or unauthorized." Fla. Stat. §673.3081(West).

*Barsan v. Trinity Fin. Services, LLC*, 258 So. 3d 516 (Fla. 3d DCA 2018).   U.C.C.

Comment 1 to Fla. Stat. §673.3081 notes "The presumption rests upon the fact that in

ordinary experience forged or unauthorized signatures are very uncommon, and normally

any evidence is within the control of, or more accessible to, the defendant. The defendant

is therefore required to make some sufficient showing of the grounds for the denial before

the plaintiff is required to introduce evidence."   § 673.3081, Fla. Stat. Ann. Cmt 1.   See

also, *Bennett v. Deutsche Bank Nat. Trust Co.*, 124 So.3d 320 (Fla. 4th DCA 2013).

   97.      However, U.S. District Court Judge Kevin Karas for the Southern District

of New York addressed a Texas statute identical to Fla. Stat. §673.3081 and wrote:

> *In the wake of the recent foreclosure crisis, and the dubiousness of the common robo-signing practices of various banks and other foreclosing entities*, see, e.g., Matthew Petrozziello, <u>Who Can Enforce? The Murky World of Robo-Signed Mortgages</u>, 67 Rutgers U. L. Rev. 1061, 1068-70 (2015), *it may be time to reconsider whether "forged or unauthorized signatures" remain "very uncommon*," see Eric A. Zacks & Dustin A. Zacks, <u>A Standing Question: Mortgages, Assignments, and Foreclosure</u>, 40 J. Corp. L. 705, 706 (2015) ("*[I]n the face of an overwhelming volume of foreclosures to be processed, mortgagees and their assignees often failed to assign the mortgages properly, and, in some instances, committed fraud or other unauthorized acts in order to correct the assignment paper trail.*"). Also, this is not a case where evidence regarding the validity of the indorsement would be in the control of, or more accessible to, Debtor. *One would expect that a large banking and financial services company would have readily accessible evidence by which it could establish the timing and validity of the blank indorsement.  In re Carssow-Franklin*, 213 F. Supp. 3d 577, 591 (S.D.N.Y. 2016)(emphasis added).

   98.      Judge Karas affirmed the Honorable Robert N. Drain, U.S. Bankruptcy

Court Judge for the Southern District of New York, who found that Wells Fargo employed

a process of "improving its own position by creating new documents and indorsements

from third parties to itself to ensure that it could enforce its claims." *In re Carssow-Franklin*

*(Wells Fargo Bank, N.A. v. Carssow-Franklin)*, 213 F. Supp. 3d 577, --- [2016 WL

5660325, *6-10] (S.D.N.Y. 2016). Judge Drain applied the same law found in Fla. Stat. §673.3081, noting Wells Fargo systematically created "after-the-fact" documentation "on behalf of third parties" by in-house "assignment and indorsement teams" which Wells Fargo tried to cover-up with an invalid assignment by Mortgage Electronic Registration System, Inc ("MERS").

99.     Judge Karas affirmed Judge Drain's finding that the Wells Fargo Witness' testimony showed "the general indorsement and assignment practices of Wells Fargo endorsement and assignment teams, … showed 'a general willingness and practice on Wells Fargo's part to create documentary evidence, after the fact, when enforcing its claims.'" *Id.* at 585. Judge Karas also noted "the fact that Wells Fargo had assignment and indorsement teams that, as the bankruptcy court found, would act to improve the record with respect to various notes and deeds of trust in Wells Fargo's possession, makes the fact that the indorsement at issue here was added after-the-fact to improve Wells Fargo's standing more probable 'than it would be without the evidence.'" *Id.*

100.     Wells Fargo admitted to using assignment and endorsement teams to create documentary evidence, after the fact, when enforcing its claims. BANA denied creating after the fact endorsements for Countrywide or after the fact assignments. JPMC also denied creating after the fact endorsements for WAMU.

101.     There is a common link between JPMC, BANA, and Wells Fargo in that they all used the same "mortgage servicing platform" ("MSP") provided by Black Knight Financial, formerly Lender Processing Services ("LPS"). Before the NMS, Wells Fargo, BANA, and JPMC also all used the same network of LPS foreclosure mill attorneys to prosecute foreclosures with lost note counts, unendorsed notes, and false, fictitious and "robo-signed" mortgage assignments claiming Mortgage Electronic Registration Systems,

Inc., ("MERS") sold the note and mortgage to the plaintiff in foreclosures across the nation.

102.    At that time, there had already been findings that MERS has no ownership in the notes or mortgages and therefore could not sell notes and mortgages to anyone. In 2005, the Honorable Miami-Dade Circuit Court Judge Jon Gordon struck as sham a wave of foreclosures in filed in the name of MERS. APPENDIX II F is a copy of Judge Gordon's Order. The first wave of foreclosures across the nation were all filed in the name of MERS and alleged MERS owns and holds the notes and mortgages. Judge Gordon struck the cases as sham because MERS admitted it did not own or hold notes or mortgages.

103.    The following year, in 2006, Fannie Mae commissioned a report by Baker Hostetler which discussed the "Florida MERS Embarrassment" following the Judge Gordon's ruling. APPENDIX II G is a copy of the Baker Hostetler Report to Fannie Mae. The Baker Hostetler Report found "during consolidated hearings that resulted in the judges dismissing 24 foreclosure actions, three judges (including one who took the time to observe and comment) criticized MERS for routinely filing 'sham' pleadings and 'false affidavits' regarding its interest in promissory notes and supposed lost notes. One judge questioned whether large numbers of foreclosures would have to be reversed due to fraud on the court." The Baker Hostetler Report further concluded:

### Findings on Foreclosure Procedures

We conclude that foreclosure attorneys in Florida are routinely filing false pleadings and affidavits regarding the plaintiffs - MERS or servicers - interest in the proceedings and regarding lost, missing or destroyed promissory notes. The practice could be occurring elsewhere. It is axiomatic that the practice is improper and should be stopped.

104.    Four years later, on May 25, 2010, the Jacksonville Criminal Investigative Division ("CID") of the Federal Bureau of Investigation's Financial Crimes Section ("FBI/FCS") issued an unclassified memorandum after its preliminary robo-signing

investigation finding:

> Jacksonville opened captioned matter in February of 2010. The matter was opened based on allegations that DOCX, a predecessor of **Lender Processing Services (LPS) had created millions of false and fictitious assignments of mortgages that were used to support foreclosure actions across the United States**... The fraud ... was the result of negligence in the process of creating Mortgage Backed Securities (MBS). **The negligence occurred throughout the United States....**
>
> **LPS and other default services created false and fraudulent documents which appeared to support their foreclosure positions. LPS created those documents despite the fact that some of the entities that originally issued the mortgage no longer existed... LPS and the associated foreclosure mills utilized these false and fictitious documents in Courts across the nation to foreclose on homeowners**...
>
> **Due to the foreclosure crisis in the United States and the financial incentive of loan servicers to expedite the foreclosure process, default service companies such as LPS have cause the judicial process as it relates to foreclosures to be corrupted with countless false and fraudulent filings.** Attorneys for home owners have begun to recognize the absence of clear titles and have challenged these fraudulent assignments of mortgages in cases across the United States. **Cases in Florida have reached the Florida Supreme Court, while Judges in other districts across the United States have thrown out foreclosure cases and threatened sanctions against the attorneys that are filing the fraudulent motions**. APPENDIX II H to this Complaint is a copy of the CID FBI/FCS Memo dated May 25, 2010. (emphasis added).

105.     On June 24, 2010, the Jacksonville CID of the FBI/FCS issued a second unclassified memorandum finding "... **this matter has the potential to be a top ten Corporate Fraud case in CID** ... CID recognizes all of these cases will be inter-related as the vast majority of the fraudulent assignments of mortgages were originated under the LPS umbrella in Jacksonville, Florida." (emphasis added).   APPENDIX II I to this Complaint is a copy of the  CID FBI/FCS Memo dated June 24, 2010.

106.     Also in 2010, the Florida Attorney General's Office exposed the "Robo-Signing Scandal" where JPMC, BANA, Wells Fargo, and other large mortgage servicers were caught presenting false, fabricated evidence to prove standing in judicial foreclosures

across the nation. Specifically, JPMC created materially false and misleading mortgage assignments which were improperly executed by unauthorized signors using the signatures of authorized signors, recorded in the public records, and presented in foreclosure courts nationwide as fraudulent evidence of standing to foreclose.

107.    The Florida Attorney General's office even issued a powerpoint presentation entitled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases" that detailed the robosigning scandal's rampant use of false MERS assignments. APPENDIX II J is a copy of the Florida Attorney General's Office powerpoint presentation entitled "Unfair Deceptive and Unconscionable Acts in Foreclosures."

108.    The following year, in March of 2011, the OCC forced JPMC into a consent judgment as a result of the Robo-signing scandal that found JPMC was using false, robo-signed MERS assignments and also litigating cases without properly endorsed notes. APPENDIX II K to this Complaint is a copy of the 2011 OCC Consent Judgment. Bank of America and Wells Fargo were also required to enter into the same Consent Judgment.

109.    The OCC Consent Judgment required JPMC to conduct an Independent Foreclosure Review ("IFR") and identify every foreclosure case filed without a properly endorsed note pending between 2009 and 2010. The OCC demanded that IFR so JPMC could identify homeowners to be compensated for the fraud in their foreclosure cases. There was a pattern and practice in foreclosures pending between 2009 and 2010, to file complaints without a properly endorsed note on loans originated by Washington Mutual Bank, FA ("WAMU") in judicial foreclosure states from Florida to Ohio to Hawaii and across the nation.

110.    On February 9, 2012, the U.S. Department of Justice ("DOJ") and 49 State attorneys general announced a proposed settlement of $25 billion with JPMC and four other

mortgage servicers for their reported foreclosure misconduct.  Prior to that settlement, JPMC's misconduct in pursuing foreclosures of mortgages insured by the Federal Housing Agency ("FHA") (a division of United States Department of Housing and Urban Development ("HUD")) had resulting in thousands of FHA mortgage-insurance claims being improperly paid.  The United States had sued to recover damages for those false claims, and to impose civil penalties under the FCA and the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), and the Defendants agreed to imposition of a consent judgment.  APPENDIX II L to this Complaint is a copy of the Government's complaint against the Defendants and various other banking entities, filed on March 14, 2012; APPENDIX II M is a copy of the ensuing Consent Judgment, filed on April 4, 2012, against JPMC in that action.  Florida, Ohio, Hawaii, and other states joined the suit alleging violations of state laws against unfair and deceptive consumer practices.

111.    As used herein, the terms "National Mortgage Settlement" and "NMS" refer to the settlement of all those allegations detailed within APPENDIX II N hereto.  The "JPMC NMS Consent Judgment" refers to the Consent Judgment specifically entered against JPMC, with their consent, on April 4, 2012 and attached hereto as APPENDIX II M.

112.    The NMS Complaint and the ensuing JPMC NMS Consent Judgment of April 4, 2012 resulted in part from an investigation of possible false claims by JPMC.  The Office of Inspector General (the "OIG") within HUD conducted the investigation.  On March 12, 2012, the OIG's Regional Inspector General for Audit in HUD's Region VI (which includes Charlotte, North Carolina) issued a report of that investigation.  APPENDIX II O to this complaint is a copy of that report.   That investigation confined itself to claims submitted within a "review period" of October 1, 2008 through September

30, 2010.

113.    As a result of misconduct pursuing foreclosures of FHA-insured mortgages

during that review period, the OIG investigation concluded "JPMC may have conveyed

flawed or improper titles to HUD because it did not establish a control environment which

ensured that affiants performed a due diligence review of the facts submitted to courts and

that employees properly notarized documents." APPENDIX II O, pg. 5.

114.    There are documented examples of JPMC, Wells Fargo, BANA and others

relying on an note with endorsements not found on the copy attached to foreclosure

complaint.[7] Florida law on the point made it decidedly clear that proof Plaintiff filed the

---

[7] See, *Lloyd v. Bank of New York Mellon*, 160 So.3d 513 (Fla. 4th DCA 2015)(Trial
judgment reversed without evidence endorsement occurred before filing the complaint
through additional evidence); *Farkas v. U.S. Bank*, --- So.3d ----, 2015 WL 3396644 (Fla.
4th DCA 2015)(witness only proved standing at trial not at inception of case when
complaint lacked any endorsements); *Matthews v. Federal Nat. Mortg. Ass'n*, 160 So.3d
131 (Fla. 4th DCA 2015)(Trial judgment reversed where endorsed original note filed
months after complaint with undated endorsement and backdate mortgage assignment);
*Wright v. Deutsche Bank Nat. Trust Co.*, 152 So.3d 1289 (Fla. 4th DCA 2015)(Trial
judgment reversed when undated endorsed note introduced at trial after complaint attached
unendorsed note); *Deutsche Bank Nat. Trust Co. v. Boglioli*, 154 So.3d 494 (Fla. 4th DCA
2015)(Affirmed Final Judgment in favor of Borrower when witness could not testify when
note was endorsed); *Joseph v. BAC Home Loans Servicing, LP*, 155 So.3d 444 (Fla. 4th
DCA 2015)(Trial judgment reversed where no evidence note endorsed at time of filing
complaint); *LaFrance v. U.S. Bank Nat. Ass'n*, 141 So.3d 754 (Fla. 4th DCA
2014)(Summary judgment reversed where complaint attached unendorsed note and trial
evidence included undated endorsed note filed 3 ½ years later); *Bristol v. Wells Fargo
Bank*, Nat. Ass'n, 137 So.3d 1130 (Fla. 4th DCA 2014)(Summary judgment reversed
where complaint attached unendorsed note and trial evidence included undated endorsed
note filed 2 years later); *Zimmerman v. JPMorgan Chase Bank No.* 134 So.3d 501 (Fla. 4th
DCA 2012)(Summary judgment reversed where complaint contained unendorsed note and
original note filed months after complaint had undated endorsement without further
evidence); *McLean v. JPMorgan Chase Bank*, 79 So. 3d 170 (Fla. 4th DCA
2012)(Summary judgment reversed in lost note count case where original note later
produced with undated special endorsement); *Vidal v. Liquidation Properties, Inc.*, 104 So.
3d 1274 (Fla. 4th DCA 2013)(Summary judgment reversed in lost note case where original
note filed months after complaint with undated endorsement and backdated mortgage
assignment); *Wells Fargo Bank NA, v. Bohatka*, 112 So. 3d 596 (Fla. 1st DCA
2013)(reversing dismissal with prejudice finding dismissal without prejudice appropriate

note without an endorsement and later produced the note with an endorsement it is per se evidence sufficient to burst the rebuttable presumption under Fla. Stat. §673.3081.

115.    JPMC successfully hid the RICO False Claims Scheme from the U.S. Government, Fannie and Freddie, and the State and Federal Court Systems so it could continue to make false claims to Fannie and Freddie in fraudulent foreclosures across Florida and across the Nation which has not previously been disclosed publicly before the Relator discovered these acts and pursued JPMC for its continued fraudulent behavior.

116.    The Relator is the original source of numerous representative samples of specific false claims made by the Defendants to Fannie and Freddie that resulted in payments made to JPMC wherein JPMC concealed from Fannie and Freddie that because of the RICO False Claims Scheme, the underlying foreclosure actions were invalid to convey marketable title.  Relator's efforts to identify additional specific claims are ongoing

---

where trial court found allonge never affixed to note and made formal complaint to the Florida Attorney General); *Focht v. Wells Fargo Bank* 124 So. 3d 308 (Fla. 2d DCA 2013)(Summary judgment reversed in lost note case where endorsed original note filed months after complaint with undated endorsement and backdated mortgage assignment); *Feltus v. U.S. Bank*, 80 So. 3d 375 (Fla. 2d DCA 2012)(Summary Judgment reversed when Bank filed lost note count and attached unendorsed note and never amended its complaint to present original note with endorsements); *Gonzales v. Deutsche Bank National Trust Company*, 95 So. 3d 251 (Fla. 2d DCA 2012)(Summary judgment reversed when undated blank endorsement filed with original note ten weeks after filing case); *Zervas v. Wells Fargo Bank*, N.A, 93 So. 3d 453 (Fla. 2d DCA 2012)(Summary judgment reversed in lost note case where original note filed months after complaint); *Cutler v. U.S. Bank*, 109 So. 3d 224 (Fla. 2d DCA 2012)(Summary judgment reversed in lost note case where original note with undated endorsement filed months after complaint); *BAC Funding Consortium, Inc. v. Jean-Jacques*, 28 So. 3d 936 (Fla. 2d DCA 2010)(reversed summary judgment in lost note count case where unendorsed note filed during case); *Verizzo v. Bank of New York*, 28 So. 3d 976 (Fla. 2nd DCA 2010)(reversed summary judgment where original note produced after filing lost note count case with endorsement not payable to Bank of New York); *Gorel v. Bank of New York Mellon*, --- So.3d ----, 2015 WL 2129505 (Fla. 5th DCA 2015)(Trial judgment reversed when undated specific endorsement to third party not attached to the complaint).

but such efforts have been obstructed by lack of access to the records in JPMC's possession.

## FIRST CLAIM FOR RELIEF

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729

117.    The allegations in paragraphs 1 through 116 above are incorporated herein by reference.

118.    By virtue of the acts described above, JPMC knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, including but not limited to improper claims for payment of Fannie and Freddie residential mortgage insurance or guarantees.

119.    In so doing, JPMC acted knowingly; that is, they possessed actual knowledge that the claims for payment were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the claims for payment; or acted in reckless disregard of the truth or falsity of the claims for payment.

120.    By virtue of the acts described above, JPMC made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

121.    In so doing, JPMC acted knowingly; that is, they possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

122.    In so doing, JPMC acted knowingly; that is, JPMC possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and

representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

123.    By virtue of the acts described above, JPMC conspired with its counsel to present or cause to be presented false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the U.S. government.

124.    Substantially the same allegations of fraud as those contained herein were not publicly disclosed in a federal criminal, civil or administrative proceeding to which the Government of the United States or its agent was a party, or in a congressional, Government Accountability Office, or other federal report, hearing, hearing, audit or investigation, or in the news media.

125.    Relator Jacobs is an original source.  Nor is this action based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.  As required by 31 U.S.C. § 3730(b) and (e), Relator Jacobs has voluntarily provided information, oral and/or written, and has sent disclosure statements of all material evidence, both before and contemporaneously with filing, to the Attorney General of the United States and to the United States Attorney for the Southern District of Florida.

### PRAYER FOR RELIEF

Plaintiff UNITED STATES OF AMERICA and Relator BRUCE JACOBS respectfully ask this Court to enter judgment against the Defendants and in favor of the Plaintiffs and Relator as follows.

(i)     An award to the Plaintiff UNITED STATES OF AMERICA of civil penalties of $11,000.00 per violation of the FCA occurring prior to November 2, 2015 and $21,563.00 for each violation thereafter, or an amount otherwise allowed by law,

(ii)    An award to the Plaintiff UNITED STATES OF AMERICA of three (3) times the damages the UNITED STATES OF AMERICA sustained because of the acts of the Defendants,

(iii)   An award to Relator BRUCE JACOBS of 25% of the proceeds of this action or any settlement, if the Government of the United States elects to intervene and proceed, or 30% of the proceeds if the Government does not so elect,

(iv)    Costs and attorney's fees as allowed by law, including the costs and fees of Relator's attorneys and the costs of the United States.

## DEMAND FOR JURY TRIAL

On behalf of Plaintiff UNITED STATES OF AMERICA and himself, and Relator BRUCE JACOBS hereby demand a jury trial as to all issues so triable.

## CERTIFICATE OF REVIEW BY RELATOR

This Complaint is being filed on February 5, 2020, in United States District Court Southern District of Florida. Before the filing of this Complaint, the Relator reviewed all material allegations within it for their truth and veracity.

/s/   Bruce Jacobs
as Plaintiff-Relator

## CERTIFICATE OF COMPLIANCE WITH 31 U.S.C. § 3730

**THE UNDERSIGNED HEREBY CERTIFIES** that the foregoing Amended Complaint shall be filed in camera with the Clerk of the Court of the Southern District of Florida and shall remain under seal pursuant to 31 U.S.C. § 3730(b)(2). As soon as allowable, the Relator shall serve this the Complaint upon all named Defendants through their counsel of record.

## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that on this the 5th day of February 2020, a copy of the foregoing Complaint, was filed under seal.  Pursuant to 31 U.S.C. § 3730(b)(2), no service shall be made upon the Defendants named herein until the seal is lifted by this Honorable Court.  As soon as the seal is lifted, the undersigned shall serve the Defendants and their counsel with this Complaint.

/s/  Bruce Jacobs
Bruce Jacobs, Esq.

Date:  February 5, 2020

Respectfully submitted,

/s/  Bruce Jacobs
Bruce Jacobs, Esq.
**Jacobs Legal, P.L.L.C.**
Alfred I. DuPont Building
169 East Flagler St., Suite 1620
Miami, FL 33131
Jacobs@JAKElegal.com
Efile@JAKElegal.com
Tel:     (305) 358-7991
Fax:     (305) 358-7992
*Lead Counsel for Plaintiff-Relator*

**The LS Law Firm**
Lilly Ann Sanchez, Esq.
Four Seasons Tower
1441 Brickell Ave., Suite 1200
Miami, FL 33131
LSanchez@TheLSfirm.com
Tel:     (305) 503-5503
Fax:     (305) 503-6801
*Co-Counsel for Plaintiff-Relator*

**Court Keeley, P.A.**
Court E. Keeley, B.C.S.
169 E. Flagler Street, Suite 1600
Miami, FL 33131
CK@CourtKeeley.com
Tel:     (305) 308-4660
*Co-Counsel for Plaintiff-Relator*

**Wasson Associates Chartered**
Roy Wasson, Esq.
28 W. Flagler, Suite 600
Miami, FL 33130
Roy@WassonandAssociates.com
Tel:     (305) 372-5220
*Co-Counsel for Plaintiff-Relator*