**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: 1:20-cv-20543-Williams-Torres**

BRUCE JACOBS,

       Plaintiff,

               v.

JP MORGAN CHASE BANK, N.A.,

       Defendant.

_____/

<u>**DEFENDANT'S MOTION TO DISMISS**</u>
<u>**AND INCORPORATED MEMORANDUM OF LAW**</u>

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

I.      Public Allegations Regarding JPMC's Conduct Regarding WAMU Loans ...................... 3

II.     This Lawsuit.......................................................................................................................... 6

        A.      Jacobs' Allegations Regarding Five Cases He Litigated Against JPMC ............... 7

        B.      Jacobs' Allegations Regarding JPMC's "False Claims" .......................................... 8

ARGUMENT ........................................................................................................................... 9

I.      Jacobs' Complaint Is Prohibited By The Public Disclosure Bar ........................................ 9

        A.      The Allegations In Jacobs' Complaint Have Been Publicly Disclosed................ 10

        B.      The Allegations In Jacobs' Complaint Are Substantially The Same As Those
                Publicly Disclosed ........................................................................................... 11

        C.      Jacobs Is Not An "Original Source" Of The Information...................................... 11

II.     Jacobs' Complaint Should Be Dismissed As A "Shotgun Pleading"............................... 13

III.    Jacobs' Complaint Does Not Adequately Allege A FCA Violation ................................. 14

        A.      Standard of Review............................................................................................ 14

        B.      Jacobs Has Not Alleged Submission Of A False Claim With Particularity .......... 15

        C.      Jacobs Has Not Alleged Falsity ......................................................................... 17

                1.      Jacobs Has Not Alleged the "RICO False Claims Scheme" With
                        Plausibility or Particularity ....................................................................... 17

                2.      Jacobs Has Not Alleged Unmarketable Title With Respect To The 40
                        Claims Supposedly Submitted to Fannie Mae and Freddie Mac.............. 18

                3.      Jacobs Has Not Alleged That Any Irregularities Would Result In
                        Unmarketable Title .................................................................................. 19

        D.      Jacobs Has Not Alleged JPMC's Knowledge....................................................... 19

CONCLUSION.......................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

Page(s)

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................15

*Burke v. JPMorgan Chase Bank, N.A.*,
  No. C 13-04249, 2017 WL 1330562 (N.D. Cal. Apr. 11, 2017) ..............................6

*Cooper v. Blue Cross Blue Shield of Florida, Inc.*,
  19 F.3d 562 (11th Cir. 1994) ....................................................................10

*Corsello v. Lincare, Inc.*,
  428 F.3d 1008 (11th Cir. 2005) .................................................................15

*Drobny v. JP Morgan Chase Bank, NA*,
  929 F. Supp. 2d 839 (N.D. Ill. 2013) ...........................................................6

*Graham County Soil & Water Conservation District v. United States ex rel.
  Wilson*, 559 U.S. 280 (2010)....................................................................10

*Jallali v. Sun Healthcare Group*,
  No. 15-14231, 2016 WL 3564248 (11th Cir. July 1, 2016).....................................15

*John J. Pembroke Living Trust v. U.S. Bank National Association for WaMu
  Series 2006-AR11 Trust*, No. 16-cv-00020, 2016 WL 9710025
  (D. Colo. Oct. 24, 2016) ...........................................................................6

*Pelletier v. Zweifel*,
  921 F.2d 1465 (11th Cir.1991) ...................................................................14

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  563 U.S. 401 (2011)...............................................................................10

*U.S. ex rel. Adams v. Wells Fargo Bank Nat. Ass'n*,
  No. 11-cv-00535, 2013 WL 6506732 (D. Nev. Dec. 11, 2013) ..............................16

*U.S. ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*,
  816 F.3d 428 (6th Cir. 2016) .....................................................................13

*U.S. ex rel. Aquino v. University of Miami*,
  250 F. Supp. 3d 1319 (S.D. Fla. 2017) ..............................................14, 15, 17, 19

*U.S. ex rel. Bernier v. InfiLaw Corp.*,
  311 F. Supp. 3d 1288 (M.D. Fla. 2018)...........................................................11

*U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*,
    290 F.3d 1301 (11th Cir. 2002) ........................................................16

*U.S. ex rel. Keeler v. Eisai, Inc.*,
    568 F. App'x 783 (11th Cir. 2014) ....................................................15

*U.S. ex rel. Lorona v. Infilaw Corp.*,
    No. 15-cv-959, *2019 WL 3778389 (M.D. Fla. Aug. 12, 2019)..........11

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
    812 F.3d 294 (3d Cir. 2016)........................................................11, 13

*U.S. ex rel. Osheroff v. Humana Inc.*,
    776 F.3d 805 (11th Cir. 2015) ..........................................10, 11, 13

*U.S. ex rel. Todd v. Fidelity National Financial, Inc.*,
    No. 12-cv-666, 2014 WL 4636394 (D. Colo. Sept. 16, 2014)..............16

*Universal Health Services, Inc. v. United States*,
    136 S. Ct. 1989 (2016).....................................................................20

*Urquilla-Diaz v. Kaplan University*,
    780 F.3d 1039 (11th Cir. 2015) .........................................................15

*Vibe Micro, Inc. v. Shabanets*,
    878 F.3d 1291 (11th Cir. 2018) .........................................................13

*Watts v. Florida International University*,
    495 F.3d 1289 (11th Cir. 2007) .........................................................15

*Weiland v. Palm Beach County Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) ....................................................13, 14

## FEDERAL STATUTES

31 U.S.C.
    § 3729.........................................................................................14, 17, 20
    § 3730.............................................................................................10, 11

## STATE STATUTES

Fla. Stat.
    § 673.2031.........................................................................................................................7
    § 673.2041.........................................................................................................................4
    § 673.3011.....................................................................................................................3, 7
    § 673.8031.......................................................................................................................18
    § 702.036.........................................................................................................................19

R.C. 1303.36...........................................................................................................................18

JPMorgan Chase Bank, N.A. ("JPMC") respectfully moves this Court to dismiss with prejudice Plaintiff-Relator Bruce Jacobs' Corrected False Claims Act Complaint pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6).  The Complaint should be dismissed because (1) Jacobs' claims are prohibited by the False Claims Act's public disclosure bar, (2) the Complaint is an impermissible shotgun pleading, and (3) the Complaint fails to allege, plausibly or with particularity, that JPMC violated the False Claims Act.

## INTRODUCTION

In September 2008, JPMC purchased the residential mortgage loans and mortgage servicing rights of Washington Mutual Bank ("WAMU") from the Federal Deposit Insurance Corporation.  Jacobs alleges—notwithstanding sworn testimony to the contrary and no evidence in support—that JPMC applied WAMU endorsement stamps to WAMU promissory notes years after WAMU ceased to exist, and then presented those promissory notes to courts in judicial foreclosure proceedings.  According to Jacobs, this allegedly fraudulent conduct meant that JPMC failed to obtain good marketable title in those foreclosure proceedings, and that JPMC violated the False Claims Act ("FCA") by making false claims when it presented those foreclosure titles to Fannie Mae and Freddie Mac.

Jacobs claims that he learned of this supposed endorsement scheme through litigating five foreclosure cases against JPMC.  His allegations about this supposed scheme are meritless. But just as important for this motion, the allegations are also not new.  For years, homeowners in foreclosure proceedings have advanced these same unsupported allegations—namely, that JPMC, not WAMU, endorsed WAMU promissory notes; that JPMC did so after WAMU had failed; and that JPMC could not rely on these notes to establish standing to foreclose.  Again, the homeowners offered no evidence to support these allegations.  But because the allegations have long been public, the FCA's public disclosure bar—which prohibits *qui tam* actions alleging conduct that has already been disclosed publicly—requires dismissal with prejudice.

Further, to the extent the Court does not dismiss under the public disclosure bar, it should dismiss Jacobs' Complaint as an impermissible "shotgun pleading."  Jacobs' Complaint consists of largely illogical and irrelevant allegations, rendering it difficult for the Court or JPMC to understand the conduct alleged or how it supposedly violates the FCA.  The Eleventh Circuit has explicitly warned against this type of complaint.  *See, e.g.*, *Vibe Micro, Inc. v. Shabanets*, 878

F.3d 1291, 1295 (11th Cir. 2018); *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).

Jacobs' complaint should also be dismissed because it does not come close to meeting the heightened pleading standard of Rule 9(b) or even the plausibility standard of Rule 8.  This is true for several reasons.

*First*, a FCA case turns on the actual submission of a false claim—yet Jacobs' Complaint provides almost no allegations, and certainly no particularized allegations, regarding the claims that JPMC allegedly submitted to Fannie Mae and Freddie Mac.  It includes contradictory and confusing allegations regarding what the claims were for, what the claims consisted of, or what payments JPMC supposedly received as a result.

*Second*, Jacobs' Complaint does not adequately allege falsity—the lynchpin of a FCA claim.  Jacobs makes conclusory allegations that the five cases he litigated show that JPMC fraudulently endorsed the WAMU promissory notes and that any foreclosures that relied on those notes resulted in unmarketable title.  But the sworn testimony from these cases points to the opposite conclusion—that WAMU, not JPMC, endorsed the promissory notes.  Even if the five cases did suggest some impropriety with respect to the endorsement of those WAMU notes, the Complaint includes no allegations to connect that alleged misconduct from the five foreclosure cases Jacobs handled with the 40 "representative sample" claims (identified in the appendix to the Complaint) that JPMC supposedly submitted to Fannie Mae and Freddie Mac.  Jacobs does not allege that the loans for the five cases he litigated were submitted to Fannie Mae and Freddie Mac, nor does he allege that he litigated the foreclosures associated with those 40 representative claims.  In fact, the Complaint does not include any allegations suggesting anything improper about those claims.  Further still, had Jacobs alleged some irregularity in the foreclosures related to the 40 sample loans (he does not), these irregularities would not under Florida law result in unmarketable title.  In other words, even if everything Jacobs alleges about JPMC's endorsement process was true, the foreclosure titles nonetheless would be marketable— and therefore the claims Jacobs says JPMC submitted to Fannie Mae and Freddie Mac *still* would not be false.

*Third*, and finally, not only does the Complaint fail to plead with particularity the submission of a claim or how any such claim might be false, but it also does not even attempt to allege any facts regarding JPMC's *knowledge* that any of those 40 claims falsely attested to the

2

marketability of foreclosure title, notwithstanding that the FCA's scienter requirement is a rigorous one.  For each of these reasons, the Complaint fails to state a claim and should be dismissed.

**BACKGROUND**

**I.    Public Allegations Regarding JPMC's Conduct Regarding WAMU Loans**

In September 2008, the Office of Thrift Supervision closed WAMU, and the Federal Deposit Insurance Corporation (FDIC) was named the receiver of the failed bank.  JPMC then purchased certain of WAMU's assets from the FDIC, including WAMU's residential mortgage loans and the servicing rights with respect to those mortgages.

As relevant to this action, when a Florida mortgagor defaults, the mortgagee or servicer must file a foreclosure complaint in state court; Florida is a judicial foreclosure state, and so foreclosures must occur via the court process.  The complaint must include "affirmative allegations" stating that "at the time the proceeding is commenced," "the plaintiff is the holder of the original note secured by the mortgage," Fla. Stat. § 702.015(2)(a), or, in the alternative, that it is "entitled to enforce [the] note" as a non-holder, *id*. § 673.3011.  A foreclosing party claiming to be a note holder must file with its complaint a certification that includes "copies of the note." *Id*. § 702.015(4).  If the foreclosing party meets these requirements, it has standing under Florida law to foreclose.  *See id*. § 702.015(1)-(2).

Since WAMU's failure in 2008, mortgagors have routinely challenged JPMC's foreclosures on loans that it purchased from WAMU, raising questions regarding the validity of the endorsement on WAMU promissory notes.  Cosgrove Decl., Ex. 1 at 1.  JPMC has consistently disputed these meritless allegations; we accept them here—as we must—only for purposes of this motion to dismiss.

The endorsements at issue typically include a stamped signature of WAMU and also the signature of Cynthia Riley or other WAMU personnel, and are endorsed "in blank," meaning they are not made out to any particular entity.[1]  *Id*.  Mortgagors and their counsel have claimed

---

[1] An endorsement is a signature—a writing or mark on the promissory note that indicates an intent to negotiate the instrument.  A writing or mark by the present holder of a note is an endorsement unless accompanying words or other circumstances unambiguously indicate that it was made for purposes other than endorsement.  *See, e.g.*, Fla Stat. § 673.2041.  An endorsement may name the transferee, or, as here, may be endorsed in "blank," meaning that it does not name the transferee.  A note endorsed in blank becomes a bearer instrument, and any party in

3

that, notwithstanding sworn testimony to the contrary and no evidence in support, WAMU did not endorse the promissory notes, but instead JPMC applied a WAMU endorsement stamp years after it acquired the loan—after WAMU had failed and after Riley and others were no longer authorized to act on WAMU's behalf. *Id.* at 2. These mortgagors and their lawyers have claimed that JPMC relied on these notes to establish its standing to foreclose on WAMU loans. *Id.*[2]

Multiple public sources have long disclosed these allegations. For instance, in January 2014, the website *Victory Over Chase*—"[a] foreclosure information sharing site committed to saving homes from foreclosure"—posted an article entitled "Shenanigans Abound—WAMU's Endorsement Of The Notes." *Id.* at 1. The article discusses how thousands of WAMU promissory notes include Riley's stamped endorsement, allegedly applied at a time when WAMU no longer existed and so Riley no longer worked there. The article begins by posing these questions: "Did Cynthia Riley actually endorse the notes? Or did robo-stampers endorse the Notes? Was Riley in a position of authority to endorse Notes at the time your Note was endorsed? … Is this another bank scheme to steal your home?" *Id.* The article continues by documenting how borrowers have learned more about note endorsement practices "through various discovery methods," and concludes by questioning the validity of foreclosures pursued by JPMC while relying on WAMU promissory notes bearing Riley's signature:

> Legal questions abound as the stamped blank endorsements on the WAMU … notes produced by JPMorgan Chase in countless foreclosure cases could not have been made nor authorized by Riley on mortgages that closed after November 2006. Are these Notes endorsed in Cynthia Riley's name after November 2006 fake or a possible act of fraud on the Court in foreclosure lawsuits across America? Does JPMorgan Chase Bank N.A. have any standing whatsoever?

---

possession is a holder of the note entitled to enforce it. Mortgagees authorize certain officials to affix the company's endorsement to notes, and it is common for the companies to create signature stamps bearing the company's endorsement along with the official's signature, and also to authorize other personnel to apply the stamps to endorse notes on behalf of the company. *See* Transfer and Assignment of Residential Mortgage Loans in the Secondary Mortgage Market, American Securitization Forum White Paper Series, November 16, 2010, at 3 & 11; Meredith Smith, "All About Bass and Indorsements in a Power of Sale Foreclosure," University of North Carolina School of Government, March 11, 2015.

[2] The starting premise of these claims makes no sense. It is public, government record that JPMC acquired these loans from WAMU. There is accordingly no reason why JPMC would need to apply an endorsement stamp—which would be used to effectuate a transfer of the note from JPMC to another party.

> How is it that thousands of WAMU … notes made after November 2006 came to
> be endorsed by Cynthia Riley when she was no longer employed as a Vice
> President?

*Id* at 2-3.

Another public news source, entitled "JPMorgan Chase Quits 5 ½ Year Foreclosure

Case" and dated June 2015, appears on the website *MFI Miami—Mortgage Fraud Investigation*.

Cosgrove Decl., Ex. 2.  The article, written by an alleged expert in a foreclosure case, claims that

in 2009, when JPMC filed a foreclosure case against his client Olympia Zacharakis, JPMC did

not file a copy of an endorsed note and sent a copy of an unendorsed note to the expert.  *Id.* at 2.

The article goes on to allege that the case "sat collecting dust … for three years," until 2012,

when JPMC's attorney claimed that the bank "found the missing endorsed note … [and]

provided a mortgage note endorsed by Cynthia Riley."  *Id.*  The article then describes how Ms.

Zacharakis' legal team learned that Cynthia Riley was removed as Vice President in November

2006, and therefore argued that Riley would not have had the authority to endorse the note

between 2009, when the note was unendorsed, and 2012, when the note was endorsed.  *Id.* at 4.

(As with Jacobs' allegations, this is the time period after WAMU was closed, and thus when

JPMC was in possession of the notes.)  The article concludes by claiming that, on the eve of trial,

and faced with the prospect of "hav[ing] to explain how Cynthia Riley's endorsement stamp was

affixed to the Zacharakis note," JPMC voluntarily dismissed the case.  *Id.* at 5.

The allegations made in these articles are not unique.  Other publicly available articles

recount them as well,[3] and all around the country, mortgagors have made the same allegations in

foreclosure proceedings for years, including in litigation in federal court.  *See, e.g.*, *Burke v.*

*JPMorgan Chase Bank, N.A.*, 2017 WL 1330562, at *3 (N.D. Cal. Apr. 11, 2017) (In complaint

---

[3] *See, e.g.*, Garfield, *The Mains Event: Demand that Attorney Generals Nationwide*
*Comply with LPS / BlackKnight Consent Judgments*, Livinglies Garfield Firm (Aug. 4, 2017),
https://livinglies.me/tag/cynthia-riley/ ("It is astonishing that Mains has not prevailed in his
lawsuit against … Chase.  In his lawsuits, he has variously provided evidence …[that] His Note
was 'endorsed' in blank and undated with stamp of one Cynthia Riley, a former WAMU
employee laid off from her job at WAMU before his note was endorsed"); *Foreclosures Of Old*
*Washington Mutual By JPMorgan Chase Are Easy To Beat. However, You Need A Legal Team*
*that Knows What They Are Doing,* MFI-Miami, Mortgage Fraud Investigations (Nov. 2017),
(https://mfi-miami.com/2017/11/jpmorgan-chase-1/ ("JPMorgan Chase began compulsively
stamping almost every promissory note with Riley's endorsement stamp.  MFI-Miami has a file
cabinet filled with foreclosure files containing Riley's stamp that weren't consummated until
months or years after she left Washington Mutual.").

filed in 2013, "[p]laintiffs assert that Cynthia Riley, the purported endorser of the note, testified she was laid off from WaMu in 2006.  She could not have signed the 2007 note if she was laid off in 2006."); *John J. Pembroke Living Tr. v. U.S. Bank Nat'l Ass'n for WaMu Series 2006-AR11 Tr.*, 2016 WL 9710025, at *2 (D. Colo. Oct. 24, 2016) (Following a judgment in 2015, "[p]laintiff claims to have discovered .… evidence [that] suggests either that Riley was never stationed in the location where the Note was allegedly endorsed or that Riley was no longer employed by WaMu at the time the Note was allegedly endorsed."), *aff'd*, 732 F. App'x 678 (10th Cir. 2018); *Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 842 (N.D. Ill. 2013) (In complaint filed in 2013, "[p]laintiffs base their allegations regarding the indorsement on an unattributed 'determin[ation]' that '[t]he signature stamp for the blank endorsement by Cynthia A. Riley has been reported as the one most commonly used by the people that forged that endorsement.'").

## II.    This Lawsuit

Purportedly acting as a *qui tam* relator, Jacobs parrots these same allegations in his Complaint against JPMC.  In particular, mirroring the articles just mentioned, Jacobs alleges that JPMC used document custodians to affix WAMU endorsements after WAMU no longer existed. *See* Compl. ¶ 8.  He further alleges, just like in the publicly disclosed allegations, that these endorsements bore the signatures of former WAMU employees, including Cynthia Riley and others, and that JPMC presented those endorsed promissory notes in foreclosure proceedings as evidence of standing to foreclose.[4]  *See id*. ¶¶ 9, 80.  And he alleges that JPMC and its "Outside Counsel" have covered up the scheme by refusing to produce records that show when the

---

[4] In addition to being inadequately pled, Jacobs' allegations, like those that have been publicly disclosed, are nonsensical:  There is no reason why JPMC, which acquired the WAMU loans from the FDIC, would need to apply WAMU endorsement stamps to these promissory notes.  First, JPMC could foreclose without an endorsed note.  Fla. Stat. § 673.3011(2).  Second, if in fact the FDIC had sold or assigned notes to JPMC that were not properly endorsed, JPMC would have a statutory right to compel the FDIC to endorse the notes.  Fla. Stat. § 673.2031(3).  Third, the FDIC, as receiver of WAMU, acquired all "rights, titles, powers, and privileges" of WAMU.  12 U.S.C. § 1821(d)(2).  The FDIC therefore could enforce the notes without relying on any endorsement—and when the FDIC assigned the notes to JPMC, JPMC acquired those same rights.  *LLP Mortgage Ltd. v. Cravero*, 851 So. 2d 897, 898 (Fla. 4th DCA 2003) (citing "rather universally followed proposition that an assignee stands in the shoes of the assignor and has all the rights enjoyed by the assignor").  Jacobs' theory of a grand conspiracy to violate state and federal law never accounts for these obvious legal points.

6

WAMU endorsements were affixed, and have engaged in fraud by "mislead[ing] the courts with unethical arguments." *Id*. ¶ 63; *see also id*. ¶¶ 10, 12, 15.

According to Jacobs, JPMC's alleged "forgery, perjury, [and] gross fraud" violate Florida's RICO Statute—Jacobs deems this conduct the "RICO False Claims Scheme"—and any foreclosures that relied on the "[F]orged WAMU Endorsements" meant that JPMC did not gain marketable title as a result of the foreclosure proceeding.  Compl. ¶ 12.  Jacobs alleges that, as a result, JPMC submitted false claims to Fannie Mae and Freddie Mac, in violation of requirements that JPMC convey marketable title and certify that it has done so.  *Id.* ¶ 16.  Appendix A to Jacobs' Complaint is a purported "representative sample of false claims" that Jacobs contends are "WAMU loans JPMC foreclosed upon using the Forged WAMU Endorsements and transferred title to Fannie or Freddie." *Id.* ¶¶ 29-30.

A.      **Jacobs' Allegations Regarding Five Cases He Litigated Against JPMC**

Jacobs, "an attorney who practices law in the area of foreclosure defense … in South Florida courts," Compl. ¶ 3, claims to have learned of the "RICO False Claims Scheme" through litigating foreclosure cases against JPMC.  *See id*.  And while he proceeds to reference five specific cases he litigated, *see id.* ¶¶ 64-77, none of the cases evidences the fraud he alleges, and some of the cases do not even relate to Jacobs' fraud allegations regarding WAMU note endorsements.  For instance, in describing *Lumar*, Jacobs admits that the case did not involve a WAMU endorsement stamp—rather, he alleges that it "involve[ed] a different method JPMC used to add endorsements." *Id.* ¶ 71.  In explaining the factual background surrounding another case, *Riley*, Jacobs alleges that the case involved a dispute over "a false mortgage loan schedule [and] a false mortgage assignment."  *Id.* ¶ 64.

In fact, of the cases that Jacobs litigated, only one, *Mohammed*, includes any factual allegations regarding the timing of an endorsement.  Jacobs claims that "JPMC produced a report that shows the *Mohammed* promissory note was originated on September 13, 2007, and that WAMU scanned the *Mohammed* promissory note without any endorsements … nearly a month later on October 4, 2007."  Compl. ¶ 65.  He then alleges that this report "shows the first image in JPMC's system of the Mohammed's original note with a rubberstamped Cynthia Riley blank WAMU endorsement is dated January 20, 2010." *Id.* ¶ 66.  And because in his view "JPMC produced no competent evidence that WAMU affixed the Cynthia Riley endorsement to the

*Mohammed* promissory note before shutting down in September 2008," he alleges that JPMC fraudulently applied a WAMU endorsement stamp after WAMU no longer existed.  *Id.*

However, the sworn testimony that Jacobs references—and attaches to his Complaint—directly refutes his conclusory allegation.  This testimony, from both JPMC and former WAMU personnel, generally establishes two relevant points.  First, once WAMU originated a loan, it imaged an unendorsed note in its system and then sent the note to be endorsed.  *See, e.g.*, Compl. Ex. J at 87, 95, 117; *id.* Ex. K at 31-33, 42-43, 45-46, 49.  Second, JPMC did not apply WAMU endorsement stamps to WAMU promissory notes.  *See id.* Ex. J at 109, 128, and 140.  Relying on nothing other than confusing allegations regarding whether JPMC or WAMU personnel were coached prior to their testimony, Jacobs contends that this sworn testimony is false.  *See* Compl. ¶¶ 69-77.

### B.  Jacobs' Allegations Regarding JPMC's "False Claims"

Jacobs' Complaint asserts one claim for relief under the FCA, alleging that the "RICO False Claims Scheme" resulted in JPMC submitting false mortgage claims to Fannie Mae and Freddie Mac.  Compl. ¶¶ 116-123.  He claims that foreclosure actions that were part of the "RICO False Claims Scheme" resulted in JPMC gaining unmarketable title during the foreclosure proceeding, *see id.* ¶ 7, and that any "claims" JPMC may have made to Fannie and Freddie associated with those foreclosures were false because JPMC violated Seller and Servicer Guidelines that require JPMC to convey "good and marketable title."  *Id.* ¶¶ 23-28.

Jacobs' Complaint is obscure as to the nature of the "claims" JPMC made to Fannie and Freddie or the type of payments JPMC received as a result.  On the one hand, Jacobs alleges that JPMC "transferred" properties with "unmarketable title" to Fannie and Freddie, suggesting that the alleged false claims relate to JMPC's role as a seller.  Compl. ¶ 29.  On the other hand, Jacobs alleges that JPMC is "an approved servicer" for Fannie and Freddie loans, suggesting that the alleged false claims relate to JPMC's role as a servicer.  *Id.* ¶ 32.  Moreover, Jacobs does not provide any clarity regarding what the claims are for—at one point he alleges they are for "default servicing," *id.* ¶ 32, at another he alleges they are "for the amounts of the foreclosure judgment," *id.* ¶ 31, and at still another he alleges they are "for reimbursement of foreclosure expenses," *id.* ¶ 51.  Jacobs' Complaint is also devoid of any allegations regarding specific representations that JPMC made to Fannie or Freddie, or specific statements that JPMC made in connection with any claim.

8

Perhaps most perplexing is Appendix A, the chart of 40 loans—37 from Florida and 3 from Ohio—that Jacobs alleges are representative samples of false claims that JPMC submitted to Fannie and Freddie.  The Complaint contains no allegations regarding why or how Jacobs concluded that JPMC violated the FCA in connection with these 40 loans; the Complaint does not connect these 40 loans to the alleged "RICO False Claims Scheme" in any way, nor does it even suggest that any of the 40 loans relate in any way to the five cases that Jacobs litigated. Indeed, aside from a column identifying the WAMU personnel whose signature appears on the endorsement of these 40 loans, there is no relation between Appendix A and the allegations in the Complaint.

## ARGUMENT

Jacobs' Complaint should be dismissed in its entirety for three independent reasons. First, public sources have already disclosed the allegations that Jacobs now rehashes in his Complaint.  Jacobs' Complaint does not add any material information to that which has already been disclosed.  He therefore does not qualify as an "original source," and the FCA's public disclosure bar requires dismissal with prejudice.  Second, Jacobs' Complaint is a "shotgun pleading"—it consists of incoherent, conclusory, and irrelevant allegations that fail to inform the Court or JPMC of the particular conduct at issue or how such conduct violates the FCA. Eleventh Circuit precedent requires its dismissal.  Third, Jacobs' Complaint fails to state a claim. It does not plausibly allege, or allege with the requisite particularity (1) that JPMC actually submitted any false claims to Fannie Mae or Freddie Mac; (2) that JPMC's conduct with respect to endorsements was improper or resulted in unmarketable title that rendered any claims "false;" or (3) that JPMC knew that such claims were false.  Each of these failures requires dismissal.

## I.      Jacobs' Complaint Is Prohibited By The Public Disclosure Bar

The FCA allows private plaintiffs to file suit on behalf of the United States.  But if the allegations in the relator's complaint have already been publicly disclosed—as they have here— the FCA's public disclosure bar requires the suit to be dismissed.  *See* 31 U.S.C. § 3730(e)(4)(A); *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 291-92 (2010).  The public disclosure bar attempts "to strike a balance between encouraging private persons to root out fraud," on the one hand, "and stifling parasitic lawsuits," on the other.  *Graham Cty.*, 559 U.S. at 295.  Its purpose is simple:  if the government has access

to the same allegations in the *qui tam* complaint, then the government can just as easily bring the lawsuit itself, obviating the need for a whistleblower.  *Id.* at 291-92.

The "public disclosure bar provides a broa[d] sweep."  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408 (2011) (internal quotation marks omitted).  It requires courts to dismiss an action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless the relator is an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A).  An "original source" is one who "has knowledge that is independent of and materially adds to the public disclosed allegations or transactions."  *Id.* § 3730(e)(4)(B).

In determining whether the public disclosure bar applies, courts in the Eleventh Circuit apply a three-part test, known as the *Cooper* test.  Specifically, the Court asks (1) whether the allegations in the complaint have been publicly disclosed; (2) if so, whether the allegations in the complaint are substantially the same as the allegations or transactions in the public disclosure; and, (3) if so, whether the plaintiff is an "original source" of the information.  *See*, *e.g.*, *U.S. ex rel. Osheroff v. Humana Inc*., 776 F.3d 805, 812 (11th Cir. 2015); *see also Cooper v. Blue Cross Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 n. 4 (11th Cir. 1994).

**A.     The Allegations In Jacobs' Complaint Have Been Publicly Disclosed**

Jacobs' Complaint is a copy and paste of the same arguments that mortgagors and their foreclosure attorneys have advanced for years—and have been disclosed in publicly available sources.  As discussed, media sources have detailed the precise allegation of alleged wrongdoing that Jacobs makes in his Complaint: that JPMC endorsed promissory notes on WAMU loans with signature stamps of WAMU officials who no longer worked at WAMU.  *See supra* pp. 3-5. These disclosures, which appear on public websites, suffice for purposes of the public disclosure bar.  *See*, *e.g.*, 31 U.S.C. § 3730(e)(4)(A) (a public disclosure can come from any of several enumerated sources, including "from the news media"); *Osheroff*, 776 F.3d at 813 ("Because the term 'news media' has a broad sweep, we conclude that … publicly available websites … qualify as news media for purposes of the public disclosure provision."); *see also U.S. ex rel. Lorona v. Infilaw Corp.*, 2019 WL 3778389, at *11 (M.D. Fla. Aug. 12, 2019) (stating that public disclosures can come from publicly available websites); *U.S. ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp. 3d 1288, 1292 (M.D. Fla. 2018) (same).  As also discussed, mortgagors have pressed this same theory in public court filings and have done so years before Jacobs brought the

instant suit. *See supra* pp. 6. Clearly, the allegations in Jacobs' Complaint have been disclosed publicly, satisfying the first prong of the *Cooper* test.

> **B.     The Allegations In Jacobs' Complaint Are Substantially The Same As Those Publicly Disclosed**

The Eleventh Circuit has described the second prong of the *Cooper* test as a "quick trigger." *Osheroff*, 776 F.3d at 814. It is not a scrutinizing inquiry but instead a simple comparison to determine whether the allegations in the complaint are substantially similar to the publicly disclosed allegations. *Id.* Here the inquiry is straightforward: as described above, Jacobs' allegations of JPMC's conduct are, without question, substantially similar, if not identical, to those that have been publicly disclosed.

> **C.     Jacobs Is Not An "Original Source" Of The Information**

The third prong of the *Cooper* test is also satisfied here: Jacobs is not an "original source," because he does not allege facts demonstrating that he has "knowledge that is independent of and *materially adds* to the publicly disclosed allegations." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). To materially add to the public information, a relator must "contribute information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Jacobs' allegations do not come close to meeting this standard.

Jacobs acknowledges that the Complaint's allegations of JPMC's wrongdoing with respect to WAMU endorsement stamps have been disclosed in public sources. *See* Compl. ¶ 61. Yet he contends that he is an "original source" of the allegations in his Complaint—and therefore not subject to the FCA's public disclosure bar—because his allegations "materially add" to the publicly disclosed allegations. *Id*. ¶ 20. Namely, Jacobs alleges that he "uncovered" that JPMC violated the National Mortgage Settlement Consent Judgment ("NMS") by "continuing" to engage in the "RICO False Claims Scheme" after signing the NMS in April 2012.[5] *Id.* But this argument fails for multiple reasons.

---

[5] Like much of Jacobs' Complaint, his allegations regarding the NMS are filled with contradictions that make it impossible to fully understand what he is attempting to allege. Even though he alleges at various points that JPMC *continued* to engage in the "RICO False Claims Scheme" after entering in the NMS, he also alleges that his "claims … do not hinge not [sic] on conduct uncovered before the NMS Consent Judgement," Compl. ¶ 62, suggesting that the NMS

As an initial matter, it is entirely unclear *what conduct* Jacobs believes violated the NMS: that JPMC allegedly endorsed notes with WAMU stamps post-NMS, that JPMC allegedly prosecuted foreclosures while relying on such notes post-NMS, both, or some other conduct related to the alleged "RICO False Claims Scheme."  Jacobs' allegation on this point illustrates the confusion:

> [T]he information allegedly uncovered by Relator 'materially adds' to the publicly-disclosed information because allegations that JPMC engaged in the RICO False Claims Scheme to coverup its criminal enterprise that prosecuted foreclosures for Fannie and Freddie in Florida and across the nation in violation of Florida's RICO statute since entering into the NMS Consent Judgment—and continued to rely on forged endorsements in violation of the NMS Consent Judgment and Florida's RICO statute.

*Id*. ¶ 20.  This incomprehensible allegation provides no information as to how JPMC violated the NMS—the conduct that violated it, how such conduct was prohibited by the NMS, when such conduct occurred, and the like.  That is, Jacobs does not adequately allege the very information that he claims makes him an "original source."[6]

Even assuming that Jacobs adequately alleged that JPMC's conduct violated the NMS, this would hardly qualify him as an "original source."  After all, JPMC's conduct at issue has already been disclosed in public sources post-dating the April 2012 NMS:  the articles referenced above—which disclose virtually identical allegations of wrongdoing by JPMC—are from 2014 and 2015, two and three years after JPMC signed the NMS in April 2012.  And while Jacobs adds a new legal theory surrounding these factual allegations—that JPMC's conduct violated the NMS—the FCA bars *qui tam* actions unless an "original source" adds *new material facts*, not new (and unsupported) legal theories.  *Moore*, 812 F.3d at 307 (an "original source" must "add[] in a significant way to the *essential factual background*: 'the who, what, when, where and how of the events at issue." (emphasis added)); *see also Osheroff*, 776 F.3d at 814 (relator, who

---

did not relate to JPMC's use of stamped endorsements.  Further, the primary factual allegations from the cases that Jacobs litigated describe actions that pre-date the NMS.  *See id*. ¶¶ 65-66.

[6] The closest Jacobs comes to pointing to any provision of the NMS is the following generic allegation: "Relator discovered information showing that … JPMC falsely promised to ensure compliance with 'Servicing Standards' that included standards for presenting documentation in foreclosure and bankruptcy cases."  Compl. ¶ 57.  But again, even this allegation is devoid of any details regarding how exactly JPMC violated the NMS.

alleged wrongdoing, did not qualify as an "original source" when the public disclosures alleged similar factual information but did not include an allegation of wrongdoing).

Jacobs' Complaint does not add any new information regarding JPMC's alleged fraud, much less any *materially new* information. *See U.S. ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431-32 (6th Cir. 2016) (nonprofit housing group's knowledge gained through client interactions "do not materially add to the thousands of prior problematic foreclosures already disclosed.  There is nothing significant or new about the nature of these foreclosures other than proof that there were others like them.  That doesn't add anything, materially or otherwise.").  Accordingly, Jacobs is not an "original source," and his Complaint must be dismissed with prejudice pursuant to the FCA's public disclosure bar.

## II.     Jacobs' Complaint Should Be Dismissed As A "Shotgun Pleading"

The allegations in Jacobs' Complaint are so confusing and contradictory that they fail to satisfy the most basic requirement of the Federal Rules of Civil Procedure: "a short and plain statement of the claim."  Fed. R. Civ. P. 8(a)(2).  "Courts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc.*, 878 F.3d at 1295.  Jacobs' Complaint tests that tolerance.

Most fundamentally, the Complaint fails to give JPMC adequate notice of the claim against it or the conduct on which such claim is based.  *See Weiland*, 792 F.3d at 1323 ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests[.]").  Jacobs' Complaint asserts a generic violation of the FCA, but does not allege what sections of the FCA are supposedly violated.  This omission renders it more difficult for JPMC to respond because the different sections of the FCA set out different theories of liability and contain different elements.  *See, e.g.*, 31 U.S.C. § 3729(a)(1); *U.S. ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1327 (S.D. Fla. 2017) (Williams, J.) (discussing different elements of a claim under 31 U.S.C. § 3729(a)(1)(A) and 3729(a)(1)(B)).  Even more problematic, Jacobs' allegations regarding JPMC's underlying conduct—the so-called "RICO False Claims Act Scheme"—are vague, conclusory, conspiracy-laced, and fail to inform JPMC as to the specific conduct at issue.  And, as discussed above, Jacobs' Complaint is also unclear with respect to which aspects of JPMC's alleged conduct supposedly violate the NMS, or how it does so.

This confusion about the arguably relevant allegations is bad enough; it is only compounded by the fact that Jacobs' Complaint is also filled with a host of allegations that are not remotely connected to JPMC's alleged misconduct. *See, e.g.*, *Weiland*, 792 F.3d at 1323 (a "common type" of shotgun pleading is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"); *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir.1991) ("[Plaintiff's complaints] are quintessential 'shotgun' pleadings, replete with factual allegations that could not possibly be material to any of the causes of actions they assert"). For instance, Jacobs dedicates four pages of his Complaint to a case he litigated against Bank of America, which is not a party to this case. *See* Compl. ¶¶ 89-95. Another seven pages are filled with confusing allegations related to the conduct of Wells Fargo, Bank of America, and JPMC prior to the NMS—with no coherent explanation as to how such conduct has any bearing on JPMC's conduct supposedly at issue in this case. *See id.* ¶¶ 96-114. Indeed, many of these allegations relate to JPMC's and other mortgage servicers' use of Mortgage Electronic Registration Systems, Inc. ("MERS"). *See id.* ¶¶ 100-107. But JPMC's use of MERS is not an issue in this case and has nothing to do with JPMC's promissory note endorsement practices.

Jacobs' approach—take a number of confusing allegations about JPMC (and other banks that are not defendants), throw them all into a complaint, and hope that something sticks—is a textbook definition of a shotgun pleading, and his Complaint should therefore be dismissed.

## III.   Jacobs' Complaint Does Not Adequately Allege A FCA Violation

Jacobs' Complaint should also be dismissed because it fails adequately to allege, under either Rule 8 or Rule 9(b), that JPMC violated the FCA with respect to JPMC's alleged claim for payment, the underlying conduct that supposedly made that claim false, and JPMC's alleged knowledge of such falsity.

### A.   Standard of Review

To survive a motion to dismiss, a plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) ("[The] factual allegations must be enough to raise a right to relief above the speculative level") (internal citations omitted). A claim is facially plausible if the facts alleged permit the court reasonably to infer that a defendant's conduct was unlawful, but factual allegations that are "'merely consistent with' a defendant's liability" are not facially plausible.

14

*Iqbal*, 556 U.S. at 678.  Moreover, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 792-93 (11th Cir. 2014) (internal citations omitted).

In addition, a complaint alleging a violation of the FCA must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1051 (11th Cir. 2015).  "[T]he Eleventh Circuit has recognized that while the requirements of Rule 9(b) may, in practice, make it difficult for a qui tam plaintiff to bring an action, they are necessary to prevent speculative suits against innocent actors for fraud."  *Aquino*, 250 F. Supp. 3d at 1327 (internal citation omitted).  A plaintiff must meet the particularity pleading requirement of Rule 9(b) with respect to each element of a FCA claim, *Jallali v. Sun Healthcare Group*, No. 15-14231, 2016 WL 3564248, at *1 (11th Cir. July 1, 2016), including with respect to both the submission of a false claim and the underlying conduct that renders that claim false, *Aquino*, 250 F. Supp. 3d at 1327.

### B.        Jacobs Has Not Alleged Submission Of A False Claim With Particularity

"The particularized allegation that the defendants actually submitted a false claim, and by extension that the government actually paid, is at the heart of an FCA violation."  *Aquino*, 250 F. Supp. 3d at 1329.  This allegation, much like the allegation of the underlying wrongful conduct, must be pled with particularity—a relator is required "to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of the fraudulent submissions to the government."  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  Yet Jacobs' Complaint does not allege *any* of these details with particularity—or even with clarity.

Jacobs generally alleges that JPMC failed to gain "good and marketable title" in foreclosure proceedings, and that JPMC then "submit[ted] false claims for payments from Fannie and Freddie knowing the foreclosure titles were at all times unmarketable due to criminal fraud." Compl. ¶ 13.  But the Complaint is filled with unclear and contradictory allegations about the most basic details of these claims: what JPMC submitted to Fannie Mae or Freddie Mac, what the submissions were for, and what payments Fannie Mae and Freddie Mac made as a result.  In one paragraph, Jacobs alleges that Fannie Mae and Freddie Mac made payments to JPMC "for default servicing" of the 40 loans identified in Appendix A.  *Id*. ¶ 32.  But in the immediately prior paragraph, Jacobs alleges that Fannie Mae and Freddie Mac "made payments to JPMC for the amounts of the foreclosure judgment."  *Id*. ¶ 31.  In this same paragraph, Jacobs also alleges

that Fannie Mae and Freddie Mac made "other payments and benefits" to JPMC—but does not allege what those "payments and benefits" are or whether they were in response to any claims, or what relationship they had to any alleged representation about "marketable title." *Id.* In still another paragraph, Jacobs alleges that Fannie Mae and Freddie Mac are reimbursing JPMC for "fees incurred," with no allegation as to what those fees are. *Id* ¶ 27. And in yet another paragraph, Jacobs alleges that the unidentified "claims paid" were "for reimbursement of foreclosure expenses." *Id.* ¶ 51.

In short, the Complaint makes at least five different confusing and inconsistent allegations regarding JPMC's claims to Fannie Mae and Freddie Mac. And while the Complaint alleges that "[e]very record JPMC presented in support of every request JPMC submitted to Fannie and Freddie … constitute individual false claims" (Compl. ¶ 16), the Complaint provides no information as to what these records are, what claims they supported, or any representations that JPMC made on such records. This fatal deficiency warrants dismissal. *See U.S. ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (the submission of a claim is not a "ministerial act," "but the *sine qua non* of a False Claims Act violation" (emphasis in original)).

Still further, it is not clear that claims submitted to Fannie Mae and Freddie Mac, which are publicly-traded corporations, are even actionable under the False Claims Act—especially where, as here, there is no detail regarding the claims submitted or paid. *See, e.g., U.S. ex rel. Adams v. Wells Fargo Bank Nat. Ass'n*, No. 2:11-CV-00535-RCJ, 2013 WL 6506732, at *8 (D. Nev. Dec. 11, 2013) ("The GSE are therefore not instrumentalities of the United States, and an alleged attempt to defraud them is not an alleged attempt to assert a false claim against the United States under the FCA."), *aff'd sub nom. U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016); *U.S. ex rel. Todd v. Fid. Nat'l Fin., Inc.*, No. 1:12-CV-666-REB-CBS, 2014 WL 4636394, at *10 (D. Colo. Sept. 16, 2014) ("Only actions which have the purpose and effect of causing the government to pay out money are clearly claims within the purpose of the [False Claims] Act. Plaintiff has not identified the necessary link between the money Freddie Mac received from the government and the money Freddie Mac used to pay Defendants for title policies; accordingly, the portions of Plaintiff's First and Second claims predicated on 31 U.S.C. § 3729(b)(2)(A) should be dismissed.") (internal citations omitted).

16

### C.     Jacobs Has Not Alleged Falsity

Jacobs' Complaint also fails to plead falsity—a core element of any FCA violation[7]—under either Rule 8 or Rule 9(b).  The entire basis of Jacobs' contention that JPMC's claims were "false" is that a "RICO False Claims Scheme" resulted in JPMC not acquiring "good and marketable title" in foreclosure proceedings, and that JPMC's conveyance of unmarketable title violated Fannie Mae and Freddie Mac guidelines.  Compl. ¶¶ 11, 26, 28.  Jacobs' allegations of falsity fail for three reasons: (1) he does not plausibly allege or allege with particularity the underlying "RICO False Claims Scheme;" (2) he alleges *no information* about the foreclosures or any allegedly fraudulent conduct with respect to the 40 sample loans identified in Appendix A; and (3) even if he did allege some irregularity in the foreclosures related to the 40 sample loans (which he does not), he does not allege that such irregularities resulted in JPMC failing to gain "good and marketable" title.

#### 1.     Jacobs Has Not Alleged the "RICO False Claims Scheme" With Plausibility or Particularity

Jacobs must allege, plausibly and with particularity, the underlying fraudulent scheme that supposedly rendered JPMC's foreclosure titles unmarketable.  *See, e.g.*, *Aquino*, 250 F. Supp. 3d at 1328.  Yet almost all of Jacobs' allegations regarding the supposed "RICO False Claims Scheme" are conclusory and devoid of any *factual* allegations.  The only factual allegations that Jacobs offers are those related to the five cases that he litigated.  *See* Compl. ¶¶ 64-77.  But those allegations do not even suggest wrongdoing with respect to those five cases, much less with respect to some far-reaching scheme.  Indeed, most of those allegations relate to testimony from JPMC or WAMU personnel regarding WAMU's note endorsement practices. *See id.* ¶¶ 69-77.  According to this testimony, once WAMU originated a mortgage loan, its practice was to image the promissory note into its system prior to endorsing it, and then send it to be endorsed.  *See id*. Ex. K at 31-32.  This meant that, for some promissory notes, JPMC could not pinpoint a precise date that the note was endorsed by WAMU.  Jacobs uses this unremarkable point to reach the extraordinary allegation that JPMC must have engaged in a fraudulent scheme by which it acquired WAMU endorsement stamps, applied those endorsement

---

[7] As discussed *infra* Section IV, Jacobs does not allege what section of the FCA JPMC has supposedly violated, but "falsity" is an element of claims under each section, including the two that seem to be most relevant for Jacobs' complaint: (1) the "false claim" provision, 31 U.S.C. § 3729(a)(1)(A), and (2) the "make or use" provision, *id.* § 3729(a)(1)(B).

stamps to WAMU notes long after WAMU ceased to exist, and presented those notes in foreclosure proceedings, all while misleading courts about when the endorsements were applied.

Jacobs offers no factual support for this theory. To the contrary, he points to one case that he litigated, the *Mohammed* case, that included an image of an unendorsed note from 2007, and an image of an endorsed note from 2010. Compl. ¶ 66. He alleges that because JPMC could not *definitively prove* that this specific note was endorsed prior to WAMU closing in 2008, it must mean that JPMC fraudulently endorsed it after that date. *Id.* This is simply not plausible, and in no way gives rise to any reasonable inference that JPMC engaged in the supposed fraudulent conduct at issue, especially given the sworn testimony that JPMC did not endorse WAMU promissory notes. *See id.* Ex. J at 109, 128, and 140.

Indeed, Jacobs turns the law on its head. Under the Uniform Commercial Code, endorsements are presumed authentic and authorized absent evidence to the contrary. *See, e.g.*, Fla. Stat. §673.8031; R.C. 1303.36 (Ohio). In other words, to prove its standing, JPMC is not required to "produce … competent evidence" to establish that the endorsement is valid, authentic, and authorized; the endorsement is presumed so, absent evidence to the contrary. And Jacobs' factual allegations—that there is an October 2007 image of the note without an endorsement, and a January 2010 image of the note with an endorsement—are insufficient to overcome the presumption. The law does not say that endorsements are presumed valid only if there is a contemporaneous, dated picture of the note with the endorsement. The absence of photographic image of the endorsement, taken prior to September 2008, is not evidence that the endorsement did not exist prior to September 2008. And the existence of an image of the endorsement, taken in January 2010, is not evidence that the endorsement did not exist before then, much less evidence of a forgery.

### 2. Jacobs Has Not Alleged Unmarketable Title With Respect To The 40 Claims Supposedly Submitted to Fannie Mae and Freddie Mac

Because Jacobs has not adequately alleged that JPMC's supposed conduct rendered the foreclosure title unmarketable, he has failed to plead falsity. But even if he had adequately alleged that JPMC engaged in fraud with respect to the endorsements and foreclosures in the cases that he litigated, the Complaint still fails because it does not include any allegation that any of those foreclosures resulted in the submission of any claim to Fannie or Freddie. There is simply *no connection* between the cases that Jacobs litigated and the list of 40 loans that he

alleges are examples of false claims submitted to Fannie and Freddie.  None of the cases he litigated and describes in his Complaint are included in Appendix A, the list of loans that serve as the basis for his FCA case.  *Compare* Compl. ¶¶ 64-77 *with* Ex. A.  And for the 40 foreclosures in Appendix A, there is no information whatsoever about the underlying foreclosure or endorsement, other than the fact that the promissory note included an endorsement.

In short, Jacobs' Complaint does not even attempt to allege a nexus between the cases that he litigated and describes in his Complaint and the claims allegedly submitted to Fannie Mae and Freddie Mac.  This failure requires dismissal.  *Aquino*, 250 F. Supp. 3d at 1329 ("[A] relator must show that … there was a nexus between the alleged improper practices and the submission of those claims").

### 3.    *Jacobs Has Not Alleged That Any Irregularities Would Result In Unmarketable Title*

Even if Jacobs' Complaint did include allegations that the promissory note endorsements or foreclosure processes with respect to the 40 loans were somehow improper, this alone would not be sufficient to allege that JPMC lacked marketable title with respect to those loans.  That is because 37 of the 40 loans are from Florida—and presumably the foreclosure proceedings took place in Florida—and Florida law provides that irregularities in foreclosure documents, even if they are present, do not provide a basis for challenging foreclosure title after the foreclosure judgment becomes final.  Fla. Stat. § 702.036(1)(a).  More specifically, Florida law precludes post-judgment challenges to foreclosure title if certain minimal requirements are met, namely: (1) proper service of the foreclosure complaint; (2) entry of a foreclosure judgment without a successful appeal by the borrower; (3) subsequent acquisition of the property for value by someone other than the foreclosing lender; (4) at a time when no lis pendens is pending in the county records.  *Id.*  Jacobs does not allege that these requirements were unmet with respect to the 40 foreclosures in Appendix A (or with respect to any of the foreclosures he litigated); without such allegations, Jacobs has failed to allege that any defect in the foreclosure proceedings impaired the marketability of the foreclosure titles provided to Fannie or Freddie.

### D.    **Jacobs Has Not Alleged JPMC's Knowledge**

Jacobs' Complaint also fails under Rule 9(b) and Rule 8 because he does not adequately allege JPMC's knowledge of the supposed false claims.  To satisfy the FCA's knowledge requirement, Jacobs must allege with particularity that JPMC had actual knowledge that the

19

claims were false or acted in deliberate ignorance or in reckless disregard of the truth or falsity of the information. *See, e.g.*, 31 U.S.C. § 3729(b)(1); *Aquino*, 250 F.Supp.3d at 1328. The FCA's scienter requirement is rigorous, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016), yet Jacobs does not even *attempt* to allege facts suggesting that, with respect to the 40 claims that JPMC allegedly submitted to Fannie Mae and Freddie Mac, JPMC did so with knowledge that such claims falsely attested that title was marketable. As discussed *supra*, he alleges no information at all about those claims, instead vaguely alleging as follows:

> Every record JPMC presented in support of every request JPMC submitted to Fannie and Freddie and every payment and benefit received from Fannie and Freddie while pursuing fraudulent foreclosures across Florida, and across the nation, knowing the RICO misconduct alleged herein rendered the titles at issue unmarketable constitute individual false claims.

This is the opposite of a factual allegation with particularity. And it is circular. It alleges that every claim made knowing that the alleged misconduct impaired the foreclosure title constituted a false claim, without identifying which claims were made with such knowledge. Jacobs' failure to sufficiently JPMC's knowledge is yet another grounds for dismissal.

## CONCLUSION

For the reasons discussed above, Jacobs' Complaint should be dismissed, and, pursuant to the public disclosure bar, with prejudice.

## **REQUEST FOR HEARING**

Defendant JPMC respectfully requests that the Court hold oral argument on this motion to dismiss.  Given the seriousness of the allegations—that JPMC allegedly defrauded the federal government—JPMC would appreciate the opportunity to explain, in greater detail than the page limit allows, the multiple independent grounds for dismissal of Jacob's Complaint.  JPMC believes oral argument may be especially beneficial for the Court given the lack of clarity and the length of Jacobs' Complaint: 47 pages and 28 exhibits, including some running hundreds of pages long.

Date: November 9, 2020

Respectfully submitted,

**Scott B. Cosgrove**
Florida Bar No. 161365
Andrew B. Boese
Florida Bar No.824771
Benjamin Weinberg
Florida Bar No. 61519
LEÓN COSGROVE, LLP
255 Alhambra Circle, 8th Floor
Miami, FL  33134
Telephone:  305-740-1975
Facsimile:  305-437-8158
Email: scosgrove@leoncosgrove.com
Email:  anoonan@leoncosgrove.com

Matthew T. Martens (pro hac vice)
WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone:  202-663-6921
Facsimile:  202-663-6000
Email: Matthew.Martens@wilmerhale.com

Alan E. Schoenfeld (pro hac vice)
WILMER CUTLER PICKERING
HALE & DORR LLP
250 Greenwich Street
New York, NY  10007
Telephone:  212-937-7294
Facsimile:  212-230-8888
Email: Alan.Schoenfeld@wilmerhale.com

*Attorneys for Defendant*