UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:20-cv-20543-AMC

UNITED STATES OF AMERICA,
*ex. rel.* BRUCE JACOBS,
      **Plaintiffs,**

vs.

JPMORGAN CHASE BANK, N.A.,
      **Defendant.**
_____/

**PLAINTIFF-RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (DE62) AND MOTION REQUESTING JUDICIAL NOTICE (DE63), WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiff-Relator Bruce Jacobs ("The Relator") opposes the Motion to Dismiss the First Amended Complaint and Incorporated Memorandum of Law (DE62). The motion and the request for judicial notice (DE63) should be denied. Exhibits 1-3 in the Declaration of Scott B. Cosgrove (DE62-1) are not subject to judicial notice, are irrelevant to the well-pled claims of fraud seeking relief under the False Claims Act ("FCA") contained in the Corrected First Amended Complaint ("FAC") in DE57, and are improper for judicial notice at the motion to dismiss stage.

**PRELIMINARY STATEMENT**

The First Amended Complaint (FAC) remedies the concerns contained in the order of dismissal. The FAC describes the false claims with particularity, alleging the who, what, when, where, and why. For example, Exhibits 2 & 3 present a sampling of $538,793.23 in false claims submitted by defendant JPMorgan Chase Bank, N.A. ("JPMC") (DE57-2; DE57-3). That aggregate data is divided into 14 individual loans. The per loan data is divided into distinct categories of payments identifying how much money JPMC received for servicing fees, foreclosure costs, property preservation costs, asset recovery costs, expenses, and miscellaneous expenses.

The FAC explains the alleged implied false claims, express false claims, and reverse false claims at issue (DE57, ¶¶ 213-32). JPMC submitted payment claims for fees incurred in support of servicing defaulted loans, while falsely certifying compliance (implicitly and explicitly) with the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage

Corporation ("Freddie Mac") (collectively "Fannie and Freddie" or "the GSE") guidelines and servicing contracts (DE57, ¶¶ 65-68). Had Fannie and Freddie known the truth (that the mortgage notes were not properly endorsed and that JPMC's foreclosure efforts were fraudulent), they would not have paid the claims. Instead, the loans would have been subject to the buyback provision contained in JPMC's servicing agreements requiring JPMC to repurchase the defective loans (reverse false claims theory).

The public disclosure defense does not allow dismissal of the complaint at this stage. Viewing the FAC allegations in the light most favorable to the Relator, it is readily apparent the Relator is not an opportunistic filer seeking remuneration for fraud he did not participate in exposing. First, JPMC's motion to dismiss fails to establish the anonymous blogs it mined the internet in search of constitute "news media" triggering the public disclosure bar. Congress did not contemplate "blogs" during the 1986 amendments to the FCA that added the "news media" public disclosure. The blogs do not disclose the fraud uncovered pled by Relator.

Second, two of the three anonymous blogs are unsigned and have no definitive publishing date, leaving unanswered the factual question of whether the anonymous blogs were posted and disclosed prior to the filing of this lawsuit. Only through discovery will this fact be resolved.

Third, the allegations in the anonymous blogs are not substantially similar to the FAC. The anonymous blogs address conduct in JPMC's capacity as a private banking institution, whereas the FAC addresses conduct in the context of JPMC's capacity as a servicer of Fannie and Freddie-backed loans. Unlike the anonymous blogs, the focus of the FAC's allegations is JPMC's violation of its servicing agreement and Fannie and Freddie guidelines, and its unlawful receipt of taxpayer money.

Finally, the public disclosure bar does not apply because the Relator is an original source, as the FAC plausibly alleges he has independent knowledge that materially adds to information not contained in the anonymous blogs submitted by JPMC. For example, the Relator has independent knowledge that Washington Mutual Bank FA ("WaMu") imaged its mortgage notes within days of origination, but that those images do not have endorsement stamps affixed (DE57, ¶ 132). This is an example of the type of material facts constituting fraud, absent from the anonymous blogs, that are essential to establishing that JPMC fraudulently endorsed notes. Another example is the Relator's independent knowledge that JPMC sold loans to Fannie and

Freddie (DE57, ¶¶ 171-74). Again, this is a material fact, not stated in the anonymous blogs, necessary to prove the existence of the FCA violation.

The motion to dismiss the FAC must be denied and JPMC ordered to answer.

BACKGROUND

Relator Jacobs is an experienced foreclosure lawyer and original source of evidence that JPMC submitted false claims to Fannie and Freddie when it made claims for payments in pursuit of foreclosure proceedings it knew would not result in "marketable title." (DE57, ¶ 69). Specifically, the FAC alleges JPMC fraudulently used rubber stamps to affix blank endorsements on (WaMu) promissory notes, years *after* WaMu ceased to exist and *after* the signers no longer worked for WaMu (DE57, ¶¶ 65, 102). The intentionally created false records preserved JPMC's remedies in the event of a loan default, including litigation of foreclosure proceedings nationwide.

Applying his knowledge in this area of the law, Relator personally witnessed and uncovered repeated acts of perjury and false statements under oath that were aimed at concealing JPMC's presentment of fraudulent endorsements in various foreclosure proceedings (DE57, ¶¶ 86-174). The FAC alleges this conduct constituted a criminal enterprise in violation of the RICO laws (DE57, ¶¶ 180, 189). Such criminal misconduct constituted both intrinsic and extrinsic fraud that rendered the foreclosure titles unmarketable and subject to being vacated in judicial foreclosure states across the nation (DE57, ¶ 177). Furthermore, Relator uncovered evidence that these litigations were funded by taxpayer dollars, that is, JPMC submitted claims to Fannie and Freddie for payment in connection with its servicing of defaulted loans owned by them (DE57, ¶¶ 46-64). However, JPMC failed to disclose its breach of the serving agreements and violation of the Fannie and Freddie servicing guidelines.

I.    **The First Amended Complaint.**

The FAC describes in detail the requirements for selling and servicing Fannie and Freddie-backed mortgages, citing specific provisions of the guidelines (DE57, ¶¶ 12-26). JPMC's motion to dismiss does not challenge the legal correctness of the requirements of the Fannie and Freddie guidelines. Under the guidelines, the seller/lender of the loan warrants that all right, title, and interest in the mortgage loan is sold, transferred, set over, and otherwise conveyed by the lender to Fannie Mae as of the date Fannie funds the purchase proceeds (DE57, ¶ 15). The originating lender must be the original payee on the note and the last endorsement on the note should be that of the mortgage seller (DE57, ¶ 17). The lender and servicer must also be aware of, and in full

3

compliance with, all federal, state, and local laws that apply to any of its origination, selling, or servicing practices that may have a material effect on Fannie and Freddie (DE57, ¶ 20). The lender is further required to notify Fannie immediately if, after conducting due diligence, it determines that a reasonable basis exists to conclude that a breach of a selling warranty may have occurred (DE57, ¶ 23). Such disclosures must also be reported in the annual certification (DE57, ¶ 23).

A violation of any representation or warranty found in the Servicing Guide and in the Lender Contract, including those listed above and attached as an exhibit to the FAC, is a breach of the lender contract that could trigger several remedies for Fannie and Freddie, including a requirement the seller purchase back the mortgage or make whole payments to the Fannie and Freddie (DE57, ¶ 21).

When foreclosing, the guidelines contain several other requirements. For example, the servicer must "provide the law firm with a true, correct, and complete copy of the note, including any allonge, produced from the original held by the document custodian; the original note, including any allonge; or a lost note affidavit." (DE57, ¶ 34). Following a foreclosure, the servicer is responsible for timely delivering good and marketable title to Fannie and Freddie (DE57, ¶ 19). Failure to provide proper documentation in support of a foreclosure proceeding carries significant penalties, including repurchase of the loan and compensatory fees (DE57, ¶¶ 35-36).

Additionally, on an annual basis, Fannie and Freddie require their seller/servicers to file annual certifications, within 90 days of the fiscal year-end (DE57, ¶¶ 38, 40). These are mandatory requirements, and the failure to comply is grounds for suspension or disqualification (DE57, ¶ 44). The Seller/Servicer certifies that it continues to meet Freddie Mac's eligibility requirements and comply with the provisions and requirements of the Guide and the Seller/Servicer's other Purchase Documents (DE57, ¶ 41). The servicer must affirm all representations and warranties made by the servicer in the Lender Contract regarding the servicers' mortgages continue to be accurate and true in all respects (DE57, ¶ 42). And that it complies with all applicable laws (DE57, ¶ 43).

The FAC alleges that JPMC purchased WaMu and became WaMu's successor in interest and the new servicer of the Government Sponsored Entity (GSE)-backed loans (DE57, ¶ 48). As the successor mortgage servicer, JPMC administered the WaMu-GSE-backed mortgage loans, including collecting and recording payments from borrowers. It also handled loan defaults and foreclosures (DE57, ¶ 49). As compensation for servicing mortgage loans, the GSEs paid JPMC

servicing fees and allowed it to retain late charges and other fees for special services (DE57, ¶ 51). JPMC was also reimbursed, pursuant to its servicing agreement, for payments it made for property taxes, insurance premiums, out of pocket expenses, and applicable HOA dues on defaulted property. JPMC received reimbursement for paying special assessments, and other payments made to avoid possible tax liens, as well as reimbursement for maintaining adequate property (hazard) insurance to cover damage from unforeseen casualty losses (DE57, ¶ 52).

JPMC submitted claims for servicing fees, foreclosure costs including attorney's fees, property preservation costs, asset recovery costs, expenses, and miscellaneous expenses for services rendered under its contract, totaling hundreds of millions of dollars, but knowingly and willfully failed to disclose its noncompliance with Fannie and Freddie guidelines and breach of servicing agreement (DE57, ¶ 65).

The FAC further alleges that before March 31 annually, JPMC filed annual certifications containing materially false certifications (DE57, ¶ 67).

## LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Magluta v. Samples*, 375 F.3d 1269 (11th Cir. 2004). Rule 8(a)(2) requires a short and plain statement of the claim showing the plaintiff is entitled to relief, thereby giving the defendant fair notice of the basis for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The Supreme Court clarified that to satisfy Rule 8(a)(2) at the motion to dismiss stage, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Aschcroft v. Iqbal*, 559 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (*quoting Twombly*, 550 U.S. at 556-57). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679, 129 S. Ct. 1937. All that is required to defeat a motion to dismiss is a complaint that sets forth sufficient factual allegations to plausibly support the relief requested. *Twombly*, 550 U.S. at 570.

Regarding Relator's allegations in this case, Rule 9(b) requires that the circumstances constituting fraud and mistake be pled with particularity. *See* Fed. R. Civ. P. 9(b). However, "knowledge . . . may be alleged generally." *Id*. This Circuit has interpreted Rule 9(b) to require that "some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the government." *United States ex rel. Clausen v.*

*Laboratory Corp. of America, Inc.*, 290 F.3d. 1301, 1311 (11th Cir. 2002) (emphasis in original). The Eleventh Circuit also ruled that Rule 9(b) can be satisfied without the identification of individual false claims when particularized information regarding the alleged fraudulent schemes is provided. *See United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005), *cert. denied*, 549 U.S. 1027 (2006).

The "time, place, contents, and identity" standard, however, is not a "straitjacket" for Rule 9(b). *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 187 (5th Cir. 2009). Rule 9(b)'s "particularity requirement . . . must be read in conjunction with Federal Rule of Civil Procedure 8's directives that a complaint need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a). "The purpose of Rule 9(b) is to 'alert[] Defendants to the precise misconduct with which they are charged and protect[] Defendants against spurious charges . . . .'" *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

## ARGUMENT

### I.      The FAC sufficiently alleges a violation of the False Claims Act.

Count I presents an express false certification FCA violation under § 3729(a)(1)(A)-(B) (DE57, ¶¶ 213-21). "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). *See United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (The 11th Circuit adopted the express certification theory of liability).

Count II alleges implied false certification under § 3729(a)(1)(A)-(B) (DE57, ¶ 222-27). Supreme Court precedent establishes that an FCA claim may be based on a theory of implied false certification. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995, 195 L. Ed. 2d 348 (2016). Such liability attaches where "the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement" and the failure to disclose this noncompliance is "material to the Government's payment decision." *Id*. at 1995-96.

To be material, the requirement need not be "expressly designated as conditions of payment." *Jacobs v. Bank of Am. Corp.*, No. 1:15-cv-24585-UU, 2017 U.S. Dist. LEXIS 219773, at \*35 (S.D. Fla. Mar. 20, 2017) (citing *Escobar*, 136 S. Ct. at 1995, 2001). "*Escobar* instructs courts to consider whether noncompliance is 'minor or insubstantial' and amounts to 'garden-variety breaches of contract or regulatory violations,' or, conversely, whether the Government would have attached importance to the violation in determining whether to pay the claim." *Marsteller ex rel. United States v. Lynn Tilton, Patriarch Partners, LLC*, 880 F.3d 1302, 1313 (11th Cir. 2018) (citing *Escobar*, 136 S. Ct. at 2002-03).

Count III presents a reverse false claims violation under § 3729(a)(1)(G) (DE57, ¶ 228-32). Liability under the FCA also arises when a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir. 1999).

## A. The FAC's allegations of foreclosure fraud are pled with particularity and plausibility.

JPMC begins its argument with the spurious claim that the FAC fails to adequately allege JPMC's foreclosure fraud scheme (DE62:15-16). In support of its claim, JPMC mischaracterizes the FAC as alleging that "WaMu never endorsed any of its promissory notes" and that this "allegation" is "the central allegation of the FAC." (DE62:15). The FAC makes no such allegations. Its timeline is limited to foreclosures initiated by JPMC *after* WaMu no longer existed. The FAC does not reach foreclosures initiated by WaMu nor does the FAC allege WaMu *never* endorsed notes. For this reason, JPMC's request for judicial notice (DE63) and reliance on Exhibits 1 and 2 (DE62-1:3-55) are misplaced. The exhibits are not relevant.

This litigation challenges fraudulent foreclosure practices of **JPMC**—not WaMu—supported by taxpayer dollars. The FAC alleges WaMu did not endorse its notes within days of origination, as JPMC has pertinaciously claimed in state foreclosure proceedings (DE57, ¶ 102). Because of the failure to endorse notes within days of origination, when JPMC purchased WaMu after its collapse, JPMC obtained notes that did not comply with the Fannie and Freddie servicing contract and guidelines (DE57, ¶¶ 14-17). When JPMC learned of the noncompliance, it made no disclosures to Fannie and Freddie, either voluntarily or in its annual certifications (DE57, ¶¶ 23, 65, 67-68). JPMC instead fraudulently affixed WaMu endorsements, using expired rubber

7

signature stamps of former WaMu employees, with the intent to present the endorsements as the true signature of WaMu in foreclosure proceedings (DE57, ¶¶ 72-74, 102). The Uniform Commercial Code and Florida law prohibit this. U.C.C. § 3-401(b); § 673.4011(2)(b). A foreclosure proceeding premised on a forged endorsement is not one calculated to secure "good marketable title." *See Ederer v. Fisher*, 183 So. 2d 39, 42 (Fla. 2d DCA 1965) (no valid title if "endorsement was not made by its officer whose name appeared but was executed by an employee who had no authority to sign or authorize endorsements for the corporation").

Contrary to JPMC's dismissal contentions, this litigation does not "necessarily depend[] on every promissory note for WaMu loans being fraudulently endorsed by JPMC." (DE62:15). It should be plainly obvious Relator need not establish that WaMu *never* endorsed any notes. It should be equally obvious Relator's claim does not require that he prove JPMC endorsed *every* WaMu promissory note. The FAC challenges JPMC's fraudulent foreclosure practices that were funded by the federal government and U.S. taxpayers. JPMC has persistently claimed in foreclosure proceedings that WaMu's daily practice was for all notes to be imaged within days of origination and then endorsed in the Secondary Delivery Department (DE57, ¶ 132). However, imaged copies of the notes at the time of origination are not endorsed (DE57, ¶ 132). And in its foreclosure litigation, JPMC has not produced the Secondary Delivery Department employees who allegedly endorsed the notes within days of origination (DE57, ¶ 133). It has relied solely on corporate representatives who, as Relator discovered, provided conflicting and fraudulent testimony pertaining to the timing of endorsed notes (DE57, ¶¶ 130-170). JPMC cannot be allowed to obfuscate the issues or rewrite the FAC's well-pled allegations.

**B.** **The FAC sufficiently alleges with particularity the submission of false claims.**

The FAC complies with the Court's dismissal order by specifying the false claims and false statements. The FAC identifies three counts of FCA violations. JPMC contends the FAC fails to allege the submission of a false claim, a false statement that is material to a claim, or any false statement that is material to an obligation to pay the government (DE62:17). Its two-paragraph conclusory argument is not directed to any count, so it is unclear which counts JPMC challenges. Its lack of clarity defies a response. The argument does not dispute the sufficiency of the FAC's articulation of the servicing contract and guidelines requirements. Nor does it challenge the FAC's claim that JPMC's payment was contingent upon its compliance. Moreover, the argument does not articulate how the allegations that JPMC made express and implied false certifications and false

statements are insufficient. Nor can it. The FAC alleges that before March 31 of each year, JPMC filed annual certifications that contained materially false certifications (DE57, ¶ 67 (a)-(f)).

Regarding the implied false certification theory, the FAC alleges JPMC submitted claims for servicing fees, foreclosure costs, property preservation costs, asset recovery costs, expenses, and miscellaneous expenses for services rendered under its contract totaling hundreds of millions of dollars, but knowingly and willfully failed to disclose its noncompliance with Fannie and Freddie guidelines and its breach of its servicing agreement, including but not limited to, the facts that (DE57, ¶ 65 (a)-(h)):

  a.  JPMC's notes were not properly endorsed at the time of origination;

  b.  JPMC was in breach of its life of the loan representations and warranties pertaining to clear title and first-lien enforceability;

  c.  JPMC violated applicable laws by unlawfully and fraudulently affixing WaMu endorsement stamps to cover up the lack of endorsement, years after WaMu ceased to exist and after the signers no longer worked for WaMu;

  d.  JPMC did not "provide the law firm with a true, correct, and complete copy of the note, including any allonge, produced from the original held by the document custodian; the original note, including any allonge; or a lost note affidavit," as required by Fannie Mae Servicing Guide E-1.1-02, Required Referral Documents, and Freddie Mac Seller/Servicer Guide 9301.9, Referral to foreclosure documentation requirements;

  e.  Any note using an endorsement from Cynthia Riley ("Ms. Riley"), Jess Almanza, Brenda F. Brendle, Michele Mullholand, or Robin E. Tange [**submitted by JPMC in a foreclosure proceeding**] was fraudulent;

  f.  JPMC intended to (and did) engage in a practice of misleadingly pursuing a wave of WaMu foreclosures filed without copies of endorsed promissory notes, claiming the original notes were lost, when the notes were not lost, in foreclosures across Florida and across the nation;

  g.  JPMC intended to (and did) pursue judicial foreclosure of mortgages secured by forged and falsely stamped notes, while concealing the fact that the endorsements were affixed by JPMC years after WaMu ceased to exist using rubber stamps of Cynthia Riley's signature, and others;

  h.  The title secured through the foreclosure proceedings was not good and marketable.

Regarding the reverse FCA claim, the FAC alleges JPMC's fraudulent affirmations and fraudulent omissions were material because disclosure of its noncompliance with GSE guidelines and breach of applicable representations and warranties were grounds for triggering the purchase back provisions of the GSE guidelines, requiring payment of make whole payments, and/or cancellation of JPMC's lucrative servicing agreements (DE57, ¶ 70).

The FAC further contains a representative sampling of $538,793.23 of JPMC's false claims. The aggregate data is divided into 14 individual loans. The per loan data is divided into distinct categories of payments identifying how much money JPMC received for servicing fees, foreclosure costs, property preservation costs, asset recovery costs, expenses, and miscellaneous expenses (DE57-2; DE57-3). For example, Exhibits 2 and 3 demonstrate that from June 1, 2012, to July 1, 2014, JPMC submitted claims to and received payments from the United States, through Freddie, for expenses and servicing fees totaling at least $53,850.00 solely in connection with the default servicing of the note, divided as (DE57-3:2): [1]

> Servicing Fees Payments: $2,859.298
> Foreclosure Costs Payments: $5,488
> Property Preservation Costs Payments: $31,718
> Miscellaneous Expenses Payments: $1,312
> Tax Payments: $15,332

JPMC's contention the sample deficiently fails to further divide the payments received into per month data, namely between June 1, 2012, to July 1, 2014, is baseless (DE62:17-18). JPMC provides no case law requiring an FCA lawsuit to break down payments into their smallest increments, much less for the Relator to allege such facts as a plausible FCA violation. It is sufficient that the complaint alleges specific payments in connection with individual loan files, identifying the who, what, when, where, and why.

### C. JPMC's knowledge is sufficiently alleged.

JPMC next contends that because the FAC does not sufficiently allege JPMC engaged in fraudulent conduct, the FAC also fails to allege it knew any claims were beset by fraud (DE62:18). Repeating its mischaracterization of the FAC allegations, JPMC reverts to its claim there is no allegation JPMC knew its service history of *every* WaMu loan was fraudulent (DE62:18). The argument is unavailing because it is not directed to any particular count or theory of false claim alleged in the FAC. It appears, however, JPMC's argument is directed toward the allegations regarding JPMC's fraudulent foreclosure practices. That argument is misplaced.

As previously explained, the FAC alleges JPMC fraudulently used rubber stamps to affix

---

[1] JPMC claims in footnote 6 that the Relator used an incorrect formula in Exhibit 3, because "8,153.3592" is not a formula (DE62:18). The argument is misleading. JPMC is aware that Exhibit 2 states that the service fee for Piconcelli loan is $8,153.36 (DE57-2:2), the failure of which to fully disclose confirms the Court's inability to rely on JPMC's representations about the FAC.

blank endorsements on WaMu promissory notes years *after* WaMu ceased to exist and *after* the signers no longer worked for WaMu (DE57, ¶¶ 65, 102) and submitted the fraudulent endorsements in foreclosure proceedings. The FAC alleges with particularity that JPMC subsequently committed repeated acts of perjury and falsely stated under oath that WaMu affixed those endorsements, all the while knowing WaMu did not exist at that time, with the intent to defraud state foreclosure courts, federal regulators, Fannie, and Freddie (DE57, ¶ 175).

The FAC contains examples of fraudulent testimony provided in state court proceedings (DE57, ¶¶ 131-70). The numerous instances of conflicting testimony cannot be dismissed as random, isolated events affecting credibility in a particular case. Rather, the conduct plausibly demonstrates a criminal scheme. JPMC fails to address that in Florida, it is a felony to forge an endorsement onto a promissory note. § 831.01, Fla. Stat.; *McClendon v. State*, 290 So. 2d 77, 78 (Fla. 2d DCA 1974) ("The endorsement of a check may also be the subject of forgery" if the signature is "intended to be taken as the genuine signature of another"). It is also a felony to commit perjury, § 837.02, Fla. Stat, or to obtain property by gross fraud and cheating. § 817.29, Fla. Stat.

JPMC's foreclosure conduct constitutes intrinsic and extrinsic fraud, rendering the foreclosure title unmarketable and subject to a motion to vacate judgment due to fraud under Fla. R. Civ. P. 1.540(b) in Florida, and the corresponding rules of procedure in judicial foreclosure states (DE57, ¶ 177). Under these allegations, it is reasonably apparent that JPMC was aware of its fraudulent conduct and noncompliance with Fannie and Freddie guidelines that disqualified it from being a servicer and from receiving government funding.

JPMC forgets that "knowledge" and "intent" may be averred generally. *Parkervision, Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1317 (M.D. Fla. 2013). Congress eliminated the requirement of proving specific intent in its 1986 amendments to the False Claims Act. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1307 n.12 (11th Cir. 2002). Thus, to meet Rule 9(b)'s standard, the complaint need only "include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive." *Id*. (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009)). The FAC meets these requirements.

## II.    The public disclosure bar does not apply.

JPMC's claim that this *qui tam* action is prohibited by the public disclosure bar cannot be

squared with governing law. Congress substantially narrowed the reach of the public disclosure bar in the 2010 amendments to the FCA. Specifically, "it removed the language that explicitly stated that a court was deprived of 'jurisdiction' over the FCA action if the bar applied to that action; reduced the number of enumerated public disclosure sources; and expanded the definition of 'original source' by allowing a relator who 'materially adds' to the publicly disclosed information to qualify" and removing the requirement that the original source have direct knowledge. *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 297 (3d Cir. 2016). In its amended form, the public disclosure bar provides, in pertinent part, as follows (key additions bolded):

> **(A)** The court shall dismiss an action or claim under this section, unless opposed by the Government, if **substantially the same allegations or transactions** as alleged in the action or claim were publicly disclosed—
>
> > **…**
> >
> > **(iii)** from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> **(B)** For purposes of this paragraph, "original source" means an individual who . . . who has knowledge that is independent of and **materially adds to the publicly disclosed allegations or transactions**, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C.S. § 3730(e)(4). Significantly, the public disclosure is now an affirmative defense, for which JPMC bears the burden of proof. *United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 737 n.1 (10th Cir. 2019) (explaining that "federal courts of appeals that have confronted the issue have unanimously held that the 2010 amendments transformed the public disclosure bar from a jurisdictional bar to an affirmative defense.").

The public-disclosure bar prevents "'parasitic lawsuits' that arise when 'those who learn of the fraud through public channels . . . seek remuneration although they contributed nothing to the exposure of the fraud.'" *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 296 n.16 (2010) (discussing the 1986 version of the bar statute and quoting *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992)). Viewing the FAC allegations in the light most favorable to the Relator, plainly the Relator is not an opportunistic filer seeking remuneration for fraud he did not participate in exposing. As JPMC properly concedes, under the 2010 amendments, the Court asks the following three questions: 1) whether

the allegations or transactions were publicly disclosed in news media; 2) whether the allegations in the complaint are substantially the same as the allegations or transactions in the public disclosure; and 3) whether the Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions in the anonymous blogs. *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015). The Relator addresses each argument in an abundance of caution.

      **A.**     **A random anonymous blog is not "news media" under the FCA.**

JPMC continues to assert that the random blog posts mined in its internet searches are "news media" triggering the public disclosure bar (DE62:20). Even worse, after further internet searches since its previous motion to dismiss, JPMC presents a new blog, providing a glimpse of what is to come if blogs are indeed held to be "news media": JPMC will search an estimated 1,197,982,359 websites looking for one unknown site discussing the allegations in this case. JPMC does not disclose how it came upon the blog post, much less claim the blog is widely circulated or so accessible that the government had access to information contained in it and could have filed a lawsuit based on its disclosed allegations. Its interpretation of the term "news media" stretches the term beyond its traditional meaning.

At the outset, JPMC continues to treat the term "news media" as a catchall phrase. It is not and for good reason. Courts have consistently excluded blogs from the category of "news media." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F. Supp. 3d 416, 425 (D. Del. 2014), *overruled on other grounds by United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries*, LLC, 812 F.3d 294, 300 (3d Cir. 2016) ("Similarly, the blog postings (e.g., BitterEnd blog and Sea Fever blog) are not 'news media.'"); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012) (expressing its disinclination to "conclude that in the age of basement blogging and ease of publishing, any medium that disseminates information to the public in a periodic manner is part of the "news media"). Congress clearly did not contemplate "blogs" during the 1986 amendments to the FCA that added the "news media" public disclosure. 99 P.L. 562, 100 Stat. 3153, 99 P.L. 562, 100 Stat. 3153. *See United States ex rel. Findley v. FPC-Boron Employees' Club*, 323 U.S. App. D.C. 61, 105 F.3d 675, 681 (1997) (discussing the 1986 amendments). There were no blogs then. Nor was there an internet as we know today.

In 1986, the "news media" was an identifiable, monothetic entity that gathered information

of potential interest to a segment of the public, used its editorial skills to turn the raw materials into a distinct work, and distributed that work to an audience, generally through television, radio, and print.[2] Yet, JPMC does not allege the blogs it submitted were circulated to any audience or are the product of the editorial process. Indeed, one cannot tell who authored the various blogs on the website.

JPMC's reliance on *Osheroff* is misplaced. *Osheroff* merely determined that the defendant's (Humana, Inc.) publicly available website, which was readily assessable and "intended to disseminate information about the clinics' programs, qualif[ied] as news media for purposes of the public disclosure provision." *Osheroff*, 776 F.3d at 813. Setting aside the correctness of placing Humana, Inc.'s company website in the same category as *The Washington Post*, *The Associated Press*, *CNN*, *Fox News*, and other traditional "news media," the random blog posts discovered by JPMC do not meet even *Osheroff*'s requirements. The analysis should end here. But Relator addresses the remaining issues in an abundance of caution.

**B.      JPMC's blogs have no discernable publishing date, leaving open the question of when they were publicly disclosed.**

The FCA's public disclosure bar requires that the information be disclosed before the filing of the complaint. Here, the Relator filed his complaint under seal on February 5, 2020. JPMC's submission of Exhibit 3, an undated, unsigned blog that is devoid of any comments must be closely scrutinized (DE63-1:57-63). The blog's webpage address is purportedly filed under the blogsite's January 2020 blog postings, but there is no evidence when the blog was posted on the internet or distributed. The Leon Cosgrove declaration does not reveal discovery of the blog. Nor does he explain when the blog was created and publicly disclosed. Indeed, only the person responsible for the blog can provide that information through proper discovery requests. Given its proximity to the filing date of the complaint, JPMC cannot reasonably expect the Court to assume the blog was filed at least six days before the complaint.

JPMC's second blog post (DE30-1:10-14) suffers from the same fatal defect. JPMC cannot

---

[2] FOIA states: "A representative of the news media is a person or entity that (1) gathers information of potential interest to a segment of the public; (2) uses its editorial skills to turn the raw materials into a distinct work; and (3) distributes that work to an audience." *Cause of Action v. FTC*, 961 F. Supp. 2d 142, 161 (D.D.C. 2013) (citing *Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989)).

14

secure a dismissal through reliance on incomplete evidence, so the analysis should end here.

**C.      Information in the blogs is not substantially similar to the FAC allegations.**

JPMC argues with little analysis that the blogs are substantially similar to the complaint allegations. The FCA's plain text provides for dismissal only "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . from the news media." 31 USC § 3730(e)(4)(A). Here, the submission of fraudulent endorsed notes in a foreclosure proceeding for the purpose of obtaining foreclosure judgments on defaulted loans is not **substantially** the same as submitting claims to Fannie and Freddie seeking reimbursement from taxpayer moneys for servicing defaulted loans owned by Fannie and Freddie. The former only invokes questions about JPMC's private banking practices, whereas the latter invokes matters of public concern related to the use of taxpayer dollars to fund fraudulent foreclosures.

*Cooper* and *Osheroff*, leading cases in the Eleventh Circuit, illuminate the boundaries of the substantial similarity requirement. In *Cooper*, the Court applying the former, more stringent "based on information publicly disclosed" rule, determined the complaint allegations **were not** based on information publicly disclosed. There, the FCA complaint alleged that Blue Cross Blue Shield of Florida (BCBSF), instead of paying insurance claims it was required to pay, submitted those claims to Medicare. *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 564 (11th Cir. 1994). BCBSF presented a GAO report that criticized "BCBSF's plan for monitoring payments to hospitals under the [Medicare Secondary Payer] laws and note[d] a potential conflict of interest when BCBSF is also a primary insurer for the working aged. *Id*. On motion to dismiss, BCBSF contended the suit was based on this disclosure. The Court rejected the contention "because [the GAO report] discussed the defendant 'only in the context of its role as an intermediary responsible for monitoring payment to hospitals' **and not** 'in its capacity as a primary insurer,' which was the focus of the complaint." *Osheroff*, 776 F.3d at 814 (quoting *Cooper*, 19 F.3d at 567) (emphasis added).

In contrast, the Court in *Osheroff* determined the allegations in the complaint **were** "based on" or "substantially the same as" the publicly disclosed allegations. The FCA complaint alleged that a medical clinic violated Medicare's Anti-Kickback statute by offering services without regard for medical purpose or financial need and by offering services whose value was more than nominal. The Court's public disclosure analysis relied on a *Miami Herald* article stating that clinic "patients get Ritz-Carlton treatment" and that the clinic's free services were "paid for by taxpayer dollars."

15

*Id*. at 814. The Court reasoned that these allegations were sufficient to raise an inference of government fraud. *Id*.

The anonymous blogs presented by JPMC in this litigation are more analogous to the blogs rejected by the Eleventh Circuit in *Cooper*. The anonymous blogs address conduct in JPMC's capacity as a private banking institution. The FAC, on the other hand, addresses conduct in the context of JPMC's capacity as a servicer of Fannie and Freddie-backed loans and alleges violations of the servicing agreement and GSE guidelines. In contrast, the anonymous blogs presented by JPMC do not discuss any submission of claims to Freddie and Fannie or otherwise claim that the loans were Fannie and Freddie-backed loans serviced by JPMC. More significant, the blogs do not allege that taxpayers funded JPMC's offensive foreclosure practices. Indeed, unlike *Osheroff*, JPMC does not contend it has been publicly disclosed that taxpayer dollars were used to fund JPMC's foreclosure practices. Again, the analysis should end here. The Relator addresses the next argument in an abundance of caution.

### D. Jacobs is an original source of allegations disclosed in the anonymous blogs.

JPMC claims in its motion that the anonymous blogs publicly disclose that JPMC endorsed promissory notes on WaMu loans with signature stamps of former employees, that JPMC presented the notes in foreclosure proceedings, and that JPMC and its counsel knew the conduct was improper (DE62:16). Assuming arguendo the anonymous blogs are equivalent to "news media" and discloses information substantially similar to the complaint allegations, the Relator is still an "original source," and therefore clears the public disclosure bar. Under Section 3730(e)(4)(B)(2), an "original source" means a person with knowledge "that is independent of and materially adds to the publicly disclosed allegations." *United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1323 (M.D. Fla. 2017). "Materiality in this setting requires the claimant to show it had information '[o]f such a nature that knowledge of the item would affect a person's decision-making,' is 'significant,' or is 'essential.' *United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016) (quoting Black's Law Dictionary 1124 (10th ed. 2014)).

"[A] relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background: the who, what, when, where and how of the events at issue." *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d

16

294, 307 (3d Cir. 2016) (internal citations omitted). The Eleventh Circuit has required that the "information [be] more than background information" that adds details to already publicly disclosed information. *Cooper*, 19 F.3d at 568 n.12; *Osheroff*, 776 F.3d at 815 (explaining that background information that helps one understand or contextualize a public disclosure is insufficient to grant original source status under the previous version of the statute).

### 1.   JPMC does not dispute that the Relator has independent knowledge.

JPMC does not dispute that the Relator has knowledge of JPMC's foreclosure practices independent of the blog posts, implicitly conceding that Jacobs' extensive foreclosure practice has provided him with knowledge independent of the disclosures. Indeed, the FAC plausibly alleges that the Relator acquired first-hand information that, among other things:

a.  JPMC's WaMu notes had not been endorsed within days of origination. Rather, the WaMu notes were fraudulently endorsed by JPMC long after WaMu ceased to exist.

b.  JPMC utilized rubberstamps to forge the WaMu notes by endorsing them with the signatures of former WaMu employees.

c.  After forging endorsements on the notes, JPMC foreclosed the mortgages relying on the very same forged endorsements, knowing that they did not have marketable title because of the forgery.

d.  During the foreclosure proceedings related to the fraudulently endorsed notes, JPMC and its outside counsel procured coached and fraudulent testimony that the WaMu mortgage notes had been endorsed within days of origination.

e.  The January 15, 2013, deposition of Cynthia Riley and September 1, 2015, clean-up affidavit were contrived to conceal the absence of properly endorsed notes.

f.  JPMC, as servicer of the WaMu notes, submitted claims to Fannie and Freddie requesting monies in relation to the very same notes that JPMC had forged.

g.  Because the notes that JPMC serviced had been forged, JPMC knew that its representations to Fannie and Freddie were fraudulent.

### 2.   The FAC plausibly alleges that Relator's independent knowledge materially adds to publicly disclosed allegations.

Notwithstanding the well-pled allegations of Relator's independent knowledge, JPMC doggedly insists that Relator's information does not materially contribute to information contained in the blogs. The argument is misinformed.

The FAC plausibly alleges the Relator's "independent knowledge provides that essential link necessary to prove the submission of false claims and/or use of false records." *United States ex rel. Girling v. Specialist Doctors' Grp.*, LLC, No. 8:17-cv-2647-T-24 JSS, 2020 U.S. Dist.

LEXIS 229018, at *10 (M.D. Fla. Dec. 7, 2020). As JPMC's motion to dismiss affirms, JPMC continues to maintain that WaMu endorsed notes within days of origination and that JPMC engaged in no fraudulent conduct in state foreclosure proceedings. The Relator's independent knowledge refutes JPMC's defense.

For example, the Relator has independent knowledge that WaMu imaged its mortgage notes within days of origination, but that those images do not have endorsement stamps (DE57, ¶ 132). This is a material fact that provides an essential link to the claim that JPMC fraudulently endorsed notes. And JPMC does not contend this key fact was disclosed in the anonymous blogs.

A second example is the Relator's independent knowledge obtained in *JPMC v. Mohammed*, through his deposition of Barbara Hindman, a JPMC corporate representative who was a supervisor in WaMu's national post-closing team in Jacksonville, FL in 2004. It was Ms. Hindman's department that received the note, the mortgage, and original documents (DE57, ¶ 127). In deposition, the Relator obtained testimony from Ms. Hindman that she never saw notes being endorsed (DE57, ¶ 128). She remembered the Secondary Delivery Department room, which JPMC claims was supposedly rubberstamping millions of notes with WaMu endorsements, being a "normal, quiet office environment." (DE57, ¶ 128). She did not recall any endorsement operations, rubberstamps, rubberstamp pads, or rubberstamping (DE57, ¶ 128). JPMC's motion fails to address this additional fact that clearly constitutes material evidence adding to the blogs' allegations of JPMC's fraudulent endorsement of notes.

Third, the Relator's discovery of evidence that JPMC committed new and distinct acts of fraud in foreclosure proceedings is a material addition. In the absence of physical proof that notes were endorsed within days of origination, JPMC produced corporate representatives in foreclosure proceedings to testify that WaMu's daily practice was to image all notes within mere days of origination and endorse them in the Secondary Delivery Department without scanning the endorsed notes (DE57, ¶ 132). When asked for the basis of their knowledge about the practice, the corporate representatives claimed JPMC facilitated trainings in 2016 and 2018 on the Cynthia Riley endorsement, complete with PowerPoint (DE57, ¶¶ 135-53). Through litigation in four separate JPMC foreclosures, the Relator uncovered evidence that the claim was false. To be sure, JPMC admitted there was no PowerPoint (DE57, ¶ 151), and then ultimately admitted there were no such trainings in 2016 and 2018 (DE57, ¶ 152). Corporate representatives also provided false

18

testimony that Barbara Hindman, the former WaMu executive in charge of the Post-Closing Department located in Jacksonville, Florida from 2004 to 2007, told them that she personally witnessed notes being endorsed within days of origination (DE57, ¶¶ 154-65). Through his litigation of several foreclosure proceedings, Relator uncovered that this claim was also false (*Id*). These additional acts of foreclosure fraud, which attempted to cover-up JPMC's fraudulent endorsement scheme, are material additions to information contained in the anonymous blog. They contribute to the timeline of JPMC's fraudulent conduct and support the FAC's allegations regarding JPMC's knowledge and intent, as evidenced by Relator's response to JPMC's knowledge argument. *See Resp. Mot. Dismiss Argument Section I.C.*

Fourth, the FAC identifies specific Fannie and Freddie-owned loans for which JPMC, as servicer, secured foreclosure judgments using fraudulent endorsements in what is apparently a RICO False Claims scheme (DE57, ¶¶ 180-81). This, too, is a material fact not disclosed in the anonymous blogs.

Fifth, and finally, Relator has independent knowledge that JPMC sold loans to Fannie and Freddie (DE57, ¶¶ 171-74), that JPMC submitted claims to Fannie and Freddie for taxpayer money, and that the fraudulent foreclosure proceedings were litigated by a major bank using taxpayer dollars. These and other facts are "significant, influential or relevant information" not contained in the anonymous blogs that are necessary to prove the alleged FCA violations. *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). They establish the elements of the FCA claims and debunk key anticipated defenses raised by JPMC in the various foreclosure proceedings.

The public disclosure bar does not apply. Dismissal must be denied.

## STATEMENT ON LEAVE TO AMEND

Defendant seeks dismissal with prejudice (DE62:23). The FAC pleads a plausible case. Nonetheless, to the extent the Court is inclined to dismiss the FAC with prejudice, the Relator requests leave to file a second amended complaint, or alternatively, leave to file a motion for leave to file a second amended complaint. Specifically, the Relator requests twenty-one (21) days to file a conforming pleading demonstrating that a sufficient complaint can be drafted.

## CONCLUSION

For the foregoing reasons, the Plaintiff-Relator asks this to Court deny both the motion to dismiss and the motion for judicial notice.

## REQUEST FOR HEARING

Plaintiff-Relator respectfully joins JPMC's request for hearing (DE62:24).

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**KUEHNE DAVIS LAW, P.A**.
100 S.E. 2nd St., Suite 3105
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

*s/ Court E. Keeley*
**COURT E. KEELEY, B.C.S.**
Court Keeley, P.A.
169 E. Flagler Street, Suite 1600
Miami, FL 33131
CK@CourtKeeley.com
Tel: (305) 308-4660
Fax: (305) 371-3550

*s/Bruce Jacobs*
**BRUCE JACOBS**
Florida Bar No. 116203
**JACOBS LEGAL, PLLC**
169 East Flagler Street, Suite 1620
Miami, FL 33131

Respectfully submitted,

Tel: (305) 358-7991
Fax: (305) 358-7992
efile@jakelegal.com

*s/Lilly Ann Sanchez*
**LILLY ANN SANCHEZ**
**THE LS LAW FIRM**
Fla. Bar No. 0195677
lsanchez@thelsfirm.com
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-503-5503
Fax: 305-503-6801

**WASSON ASSOCIATES CHARTERED**
**ROY WASSON**
28 W. Flagler, Suite 600
Miami, FL 33130
Roy@WassonandAssociates.com
Tel: (305) 372-5220

**TERI T. PHAM**
**ENENSTEIN PHAM & GLASS LLP**
650 Town Center Drive, Suite 840
Costa Mesa, CA 92626
Tel: 714.292.0262
*Pro Hac Vice* Application

20

**CERTIFICATE OF SERVICE**

I certify on May 13, 2021, I electronically filed this document with the Clerk using CM/ECF, and certify this document is served on all counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

By:    *S/ Benedict P. Kuehne*
        **BENEDICT P. KUEHNE**